[Crim. No. 14181. First Dist., Div. Two. May 17, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT REGINALD ESTRADA, Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, Carol Jean Ryan and Harriet Wiss Hirsch, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., and R. Gordon Baker, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

TAYLOR, P. J.—Defendant, Robert Reginald Estrada, appeals from a judgment of conviction entered on a jury verdict finding him guilty of first degree murder (Pen. Code, § 187) while armed with a deadly weapon (former Pen. Code, §§ 3024, subd. (f); 12022), namely, a dagger with a blade longer than five inches. He contends that: 1) the trial court improperly denied his motion to quash the indictment as he had shown that constitutionally cognizable groups were the object of deliberate discrimination in the selection of the grand jury panel, and further erred by preventing him from obtaining a statistical analysis that would have established a prima facie case of systematic intentional discrimination in the selection of the grand jury; 2) the search warrant was not supported by probable cause; 3) the court erroneously restricted his examination of prospective jurors; 4) the monitoring, use and recording of his jailhouse conversations with his visiting relatives violated his federal and state constitutional and statutory rights to privacy and the tape of one of these jailhouse conversations was improperly authenticated; and 5) this court abused its discretion by denying his unverified pro. per. motion to correct the record on appeal, made two and one-half years after he received the record. For the reasons set forth below, we have concluded that the judgment must be affirmed.

While no contentions concerning the sufficiency of the evidence have been raised on appeal, a brief chronology of the pertinent facts is necessary for a disposition of the issues on appeal. Viewing the record most strongly in favor of the judgment, as we must, the following evidence of the murder appears:

About 5:30 a.m. on June 21, 1974, an employee of Raytheon Electronics (Raytheon) in Mountain View, discovered in the plant parking lot the body of the victim, Mrs. Sally Ortega, defendant's mother-in-law. The body lay in a pool of blood a few feet from her car with the door ajar. A Mountain View fireman who arrived at the scene at 5:46 a.m., testified that when he arrived, the car's headlights were still on and that Mrs. Ortega's purse was sitting, apparently undisturbed, in the occupied portion of the driver's seat. He also noted that the purse was open and with a few dollar bills visible therein.

About 6:22 a.m., Sergeant David Kelso arrived at Raytheon and proceeded to stall 21 in the parking lot, where he found the victim's body and vehicle, as described by the Raytheon employee.

Dr. Richard Thomas Mason, the assistant county coroner who had conducted the autopsy on the afternoon of June 21, indicated that Mrs. Ortega had died at approximately 5 a.m. He described six major wounds in the neck, chest and abdominal area, and two smaller cut wounds or "defense wounds" on the back of the right wrist and on the left forearm.[1] He opined that the cause of death was one of the stab wounds inflicted by a double-edged knife approximately three-quarters to an inch in width and at least seven inches long. The wounds were consistent with the type of wound which might be made by a military bayonet.

At approximately 6 a.m. on the morning of June 21, defendant arrived at the home of Reyes and William Hall, his sister and brother-in-law. Defendant told Mrs. Hall in Spanish: "I'm going to tell you something

---

[1]The trajectory of each of the six major wounds was described as follows: The first was to the left side of the neck and penetrated downward seven inches into her chest cavity. The second entered the victim's upper left chest and continued downward, transecting her aorta and penetrating the left lung and the backbone..The third was at the left side of the breast where it cut through the rib and penetrated the entire width of the heart. The fourth and fifth wounds entered below the left breast and penetrated the left lung. The sixth wound penetrated the abdomen. Mason indicated that either the second or third wounds would cause rapid hemorrhage and death within minutes after the initial penetration, and that death was caused by a weapon of sufficient thickness so that it would not fracture or bend on perforating the spine. He also noted on the basis of the angle of the wounds that the first two were struck while the victim was on the ground.

confidential and I want you to—forget what I told you." He then told both of the Halls in English: "I'm going to tell you both something, but keep it to yourself and don't repeat it. I think I just killed Linda's mother." (Linda was defendant's estranged wife and the mother of their baby.) Defendant waited for Mrs. Ortega at the Raytheon parking lot and when she arrived, approached her car and inquired about his wife and baby. Mrs. Ortega replied, "They're fine, both Linda and the baby. Don't worry about them." When defendant indicated that he wanted his baby back, Mrs. Ortega apparently replied, "That's between you and Linda." He then told the Halls that he grabbed Mrs. Ortega out of her car and ". . . stabbed her in the neck, on the side and in the chest," and that ". . . she got seven or eight wounds." When asked why he had slain Mrs. Ortega, defendant replied "Because I wanted to show Linda that I mean business." Also, when the Halls indicated to defendant that there were no signs of blood on his clothing, he responded that "It was a clean job."

Defendant further stated that he had disposed of the weapon by throwing it down a manhole and that there were no witnesses to the offense. Defendant blamed Linda's mother for the problems he was having with his wife. When Mr. Hall told defendant that he should turn himself in because it was likely that he would be caught anyway, he repeated that "this was a real clean job." Defendant left the Hall residence at approximately 6:45 a.m. and indicated that he was going to work and that after work he was going to Fresno "and have a ball." Defendant was very calm during his conversation with the Halls and did not appear to be under the influence of alcohol or drugs.

Charles Albert Wright, the plant superintendent at Quickset Concrete, defendant's place of employment, and Ross Montano, leadman for the maintenance department there, testified that defendant arrived at Quickset at approximately 7 a.m. on the morning of June 21. Defendant asked for the day off to contact a lawyer as he had been served with divorce papers the night before. Permission was granted, with the condition that defendant first complete a job. He did and left Quickset at approximately 8:30 a.m.

Julian and Yvonne Salazar, defendant's nephew and his wife, testified that defendant arrived at their home at approximately 9 a.m., and after entering and greeting them said, "Tuni [Mr. Salazar] guess what I just did?" Defendant then said, "I just killed Linda's mother." He related that he had been following Mrs. Ortega for about a week, and that he had killed her in the parking lot after waiting for her for 15 minutes. He said

that after inquiring into the whereabouts of his child, he had stabbed Mrs. Ortega seven or eight times and had slit her throat. He also told the Salazars that he had done it for his baby because he wanted to get his baby away from his wife and to "get back" at her.

Defendant and Julian Salazar left the Salazar residence between 9:30 and 9:40 a.m. and went to defendant's apartment. Mr. Salazar waited in the car while defendant went into the apartment and picked up some of his clothes. They then drove to a bar where defendant dialed a telephone number and, without telling Salazar to whom the call was placed, asked Salazar to question the recipient of the telephone call about her mother. Defendant hung up immediately after Mr. Salazar complied with the request, and they returned to Salazar's apartment.

During their drive together, defendant told Mr. Salazar that he had killed Mrs. Ortega with a bayonet and that he had hidden the bayonet as well as the clothes he wore during the killing. Defendant also told Salazar that he would give himself up if his wife would agree to give their child to defendant's sister or uncle, but that if Linda refused to comply with his request, he "was going to start at the top and work down."

After they returned to the Salazar apartment, defendant indicated that he was going to Fresno, gave the key to his apartment to Mr. Salazar and told him to clean out the apartment if he was arrested. Before he left, defendant took a shower at the Salazar residence and asked Mrs. Salazar to wash some clothes for him. Those clothes were later turned over to Sergeant Kelso.

Linda Estrada testified that early on the morning of June 21, she received a phone call from her husband while she was at her sister's home. The conversation lasted approximately five minutes and no one else spoke to her besides her husband. Mrs. Estrada also indicated that her husband had owned a bayonet and that he usually kept it in the car between the seats. Early in her relationship with defendant, she told him that her mother worked at Raytheon. Mrs. Estrada admitted that she had been convicted of receiving stolen property and was sentenced to the California Rehabilitation Center, from which she was a parolee.[2]

Defendant's sister, Mrs. Virginia Salazar, testified that on June 22, defendant called her and asked to speak to Julian, her son. During the

[2]We are aware of *People* v. *Woodard*, 23 Cal.3d 329 [152 Cal.Rptr. 536, 590 P.2d 391], decided February 15, 1979. Mrs. Estrada's prior conviction was properly admitted for impeachment purposes pursuant to *Woodard.*

ensuing conversation, defendant denied any knowledge of the death of his mother-in-law or any role in it, but subsequently admitted that he had warned his wife that if she took his child, he would harm her mother. He also told Mrs. Salazar that he "wasn't through yet," and when she admonished that there be no more killing, he responded, "I'm not through yet."

Mrs. Marilyn Garcia, Mrs. Ortega's daughter-in-law who was living with her, testified that on the morning of June 21, when she left for work at 4:45 a.m., Mrs. Ortega was still at home drinking coffee, dressed and apparently ready to go to work.

Jose Aramendia, a foreman at Raytheon, indicated that Mrs. Ortega had not been asked to begin work early on June 21 and that he did not know why she might have been at the plant at 5 a.m., as her shift was from 7 a.m. to 3:30 p.m.

Walter M. Scott testified that while he was in defendant's apartment, he saw a bayonet in a cup in the kitchen which defendant told him was being soaked in garlic because "it really messes a person up."

At approximately 3 a.m. on June 21, 1974, Donald Harris, a janitor at the Raytheon plant, saw an automobile which resembled defendant's; however, he could not identify the driver of the automobile. Jeffrey Barker, a registered process server, testified that while serving marital dissolution papers on defendant on the evening of June 18, 1974, he noticed a bayonet on defendant's living room table and that he later observed the bayonet protruding from the back of defendant's pants.

Defendant was arrested in Fresno about 3 p.m. on June 22, 1974. He was taken to Mountain View by Sergeant Kelso and Detective Dennis Healy. After being duly advised of his *Miranda* rights, defendant waived them and a tape recording was made of his conversation with the officers. The tape, as edited, was played to the jury. Defendant stated that on the night of June 20, he played baseball with a regular team in San Jose. After the game, he and some of the team members went to a pizza parlor where he remained until 1 a.m. He then returned to his home, had some brandy, and went to sleep for the night. He woke up at 6 a.m. and went straight to work. His wife had taken the bayonet with her when she left their home on June 18. The last time defendant had seen the bayonet was the Wednesday before she left. Defendant denied any knowledge of where his mother-in-law was employed or any involvement in her death.

During September 1974, defendant's sister, Mrs. Reyes Hall, visited him in the county jail. She testified that during their conversation, they spoke in English, Spanish and "Pig-Latin Spanish," a means of speaking Spanish to make it unintelligible to others. Initially, defendant told her that their conversation was being monitored and taped. He then attempted to persuade her and her husband to change the testimony they had given to the grand jury. He told Mrs. Hall that he would write her a letter in order to explain how she should change the testimony. Mrs. Hall, however, informed defendant that neither she nor her husband would commit perjury. This conversation between defendant and his sister, as well as a conversation between defendant and Pablo Hernandez, his brother-in-law, were taped. Both were admitted into evidence during the trial.

Pursuant to a search warrant, defendant's apartment was searched. On the kitchen table, the officers found a green tumbler, which was similar to one in which a neighbor had observed the bayonet soaking. Sergeant Kelso testified that the tumbler was empty but had an odor of garlic. A subsequent examination for garlic traces revealed no evidence of garlic in the tumbler.

The police were unable to find either the murder weapon or the bayonet owned by defendant and identified as his by several witnesses. The fingerprints removed from the scene of the crime were not the defendant's. Although the interior of defendant's vehicle had been searched, no traces of blood were found.

The first issue on appeal is whether the trial court improperly denied defendant's motion to quash the indictment as he had established that constitutionally cognizable groups were the objects of deliberate discrimination in the selection of the jury panel, and whether the court further erred by preventing defendant from obtaining a statistical analysis that would have established a prima facie case of systematic intentional discrimination in the selection of the grand jury. Defendant was indicted on July 10, 1974, by a grand jury panel selected pursuant to procedures that predated *Taylor* v. *Louisiana* (decided Jan. 21, 1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692].

The facts pertinent to defendant's motion to quash the indictment are as follows: The matter was set for hearing on August 5, 1974, and was assigned to the Honorable Bruce F. Allen. On August 12, 1974, defendant moved to have the court disqualify itself and to have an out-of-county

judge, appointed by the Judicial Council, preside at the hearing. This motion was denied on August 15, 1974.

On August 15, 1974, defendant moved for a court-paid process server to assist in serving subpoenas on those nominated to serve on the grand jury. Such a motion was necessary in view of the district attorney's refusal to stipulate that a questionnaire, sent to these individuals, could be admitted into evidence for statistical purposes. The court, after hearing testimony as to the reasons why the public defender was unable to serve the vast number of subpoenas necessary within the time limits of the case, reserved a ruling on this issue until it was satisfied that defendant had established there was some discrimination in the selection of the grand jury panel. Ultimately, the court refused to allow defendant to inquire into the makeup of the grand jury panels during the preceding 10 years, as "nothing had been shown" with regard to the 1974 panel that found the indictment.

The court indicated that: 1) it would order the 19 members of the grand jury to appear; 2) it would attempt to have the other members of the panel not selected for the grand jury brought in without subpoena; and 3) all the judges of the superior court were alerted that they might be called as witnesses and informed that, if called, they were to suspend any proceedings and appear in court as a witness.

The hearing on the motion to quash the indictment began on August 26, 1974. The section of the superior court's internal policy pertaining to the selection of the grand jury was admitted. Pursuant to this policy, responsibility for the selection of the grand jury is lodged in Santa Clara County with the 24 judges of the superior court. Each judge is entitled to nominate one person; each of the six senior judges, however, nominates two persons. The policy expressly directs the judges to nominate people from the various supervisorial districts in proportion to the population, and to include both men and women who are "generally representative of the occupational, nationality, racial, social, and economic groups within the County." The 19 jurors are selected by lot from the panel of 30 nominees.

All 30 of the individuals nominated for the 1974 grand jury testified as to their family income, education, racial and ethnic background, occupation and age and, where the facts were a matter of personal knowledge, how they came to be nominated.

Census reports were adduced to show the characteristics of the county as a whole and to establish the various occupational categories used by the United States Census Bureau. A comparison of the makeup of the grand jury panel with the county as a whole indicated that approximately 13 percent of the panel completed 12 years or less of school, while 62 percent of the county fell into that category. Seventy-three percent of the panel as compared to 20 percent of the county had completed 16 years or better of education. As to family incomes, the figures demonstrated that, at most, 10 percent of the panel as compared to 65 percent of the population earned less than $15,000 a year. The comparison also revealed that there were *no* panel members who fell into the category of blue collar workers, while 39 percent of the county population was so classified. Less than 7 percent of the panel were between the ages of 18 and 29, while 20 percent of the county population was within that age bracket.

Dr. Harold Hodges, a sociologist from California State University at San Jose, testified as to the characteristics of the various groups—blue collar workers, youth, Mexican-Americans—which distinguished them from other segments of the community and which made them identifiable and cognizable groups. Dr. Hodges was offered by defendant as an expert witness in the field of social stratification and class. Although allowed to testify in this area, the court made no finding as to Dr. Hodges' expertise.

Ultimately, the court found that Dr. Hodges did not know "what he was talking about," and refused to allow Dr. Hodges to testify as to where certain individuals who were nominated to the grand jury might fall within his definition and classification of social strata.

Eight of the twenty-four superior court judges were also called and each testified as to the bases he used in selecting his particular nominees and to the efforts he had made to familiarize himself with a cross-section of the community. On grounds of irrelevancy, the court refused to permit the defense to make any inquiries as to the economic and social background of the judges and their understanding of the superior court's internal policy pertaining to grand jury selection.

The court denied defendant's request for an examination of the remaining 16 superior court judges, as their testimony would merely be cumulative.[3] Also, the court had previously indicated at the time of the

---

[3]Defendant objected that he had the right to examine all those involved in the selection procedure and that each judge individually had relevant information to offer on the issues before the court.

denial of defendant's motion to have an out-of-county judge appointed to hear the motion to quash the indictment, that he had no intention of testifying and had no relevant information to offer.

During the hearing, the court refused to allow the presentation of proffered defense evidence as to the composition of the grand jury panels over the past 10 years.

Finally, the court denied defendant's request for a 7- to 10-day continuance for the purpose of having a statistical analysis prepared by Dr. Peter Sperlich of the University of California at Berkeley. The court indicated that such a statistical analysis would have shown the probabilities of an identical panel as the result of a completely random selection process, and stated that "if he has to take a week to figure out if something is wrong, there is nothing wrong." Defendant was also denied a continuance to allow additional expert testimony as to social stratification and groupings, and to the various characteristics which distinguish them from other groups in the community. The motion to quash the indictment was denied in its entirety on August 28, 1974.

Defendant relies on *People* v. *Wheeler,* 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748],[4] to argue that the cognizability of certain groups has been expanded and that this expansion, in effect, makes irrelevant our holding in *People* v. *Navarette,* 54 Cal.App.3d 1064 [127 Cal.Rptr. 55].[5]

---

[4] *Wheeler, supra,* was decided on September 25, 1978, and therefore was not discussed in defendant's opening brief filed May 10, 1978, or the People's reply brief filed October 10, 1978, but was the subject of oral argument. In *Wheeler,* two black men were convicted by an all-white jury of murdering a white grocery store owner in the course of a robbery. There was no issue regarding the venire for the jury summoned to hear the case (a fact which the court emphasized) since there were a number of blacks who were actually called to the jury box, questioned on voir dire, and were passed for cause. The prosecutor, however, proceeded to strike each and every black from the jury by means of his peremptory challenges. The court held that the use of peremptory challenges to remove prospective jurors violates the right to a trial by jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution, if removal is directed only against a cognizable group.

As to the remedy appropriate for the particular violation in *Wheeler, supra,* the court held that if a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, and the trial court finds a timely prima facie case has been made, the burden shifts to the other party to show, if he can, that the peremptory challenges in question were not predicated on group bias alone (p. 281).

[5] We summarized the then applicable law in *People v. Navarette, supra,* at page 1074, as follows: ". . . at the time of the selection of the grand jury at bench, the case law uniformly held that *the grand jury selection process was subject to constitutional challenge only if the defendant sustained the burden of proving that there was a purposeful and intentional discrimination which resulted in a systematic exclusion of a cognizable or identifiable group* or class of qualified citizens from the jury. [Citations.]" (Italics added.)

Defendant here urges that as a result of the discriminatory method employed in the selection of the 1974 Santa Clara Grand Jury panel, members of certain groups were excluded and that this exclusion resulted in a violation of his right to an impartial jury drawn from a cross-section of his community. A defendant's right to a representative cross-section has long been recognized by the United States Supreme Court and our state Supreme Court (*Thiel* v. *Southern Pacific Co.,* 328 U.S. 217, 220 [90 L.Ed. 1181, 1184-1185, 66 S.Ct. 984, 166 A.L.R. 1412]; *People* v. *Carter,* 56 Cal.2d 549, 569 [15 Cal.Rptr. 645, 364 P.2d 477]). Defendant argues that the groups here excluded were comprised of the "less-educated," "young adults," "blue collar workers," and "households with family incomes less than $15,000."[6]

We turn first to the preliminary question of whether the above mentioned groups are constitutionally "cognizable" or "identifiable" (*People* v. *Navarette, supra,* 54 Cal.App.3d 1064, 1074; *Hernandez* v. *Texas,* 347 U.S. 475 [98 L.Ed. 866, 74 S.Ct. 667]; *People* v. *Fujita,* 43 Cal.App.3d 454, 475-476 [117 Cal.Rptr. 757]).

The People rely on *United States* v. *Guzman* (S.D.N.Y. 1972) 337 F.Supp. 140, 143-144, affirmed (2d Cir.) 468 F.2d 1245, certiorari denied 410 U.S. 937 [35 L.Ed.2d 602, 93 S.Ct. 1397]. ██ In *Guzman,* the court defined cognizability in a manner that is well suited for the instant purposes, as set forth below;[7] in addition, a similarly phrased definition of cognizability was recently used by our Supreme Court in *People* v. *Wheeler, supra,* 22 Cal.3d, 258, 266, as discussed below.

██ As to the first group, defendant defines the "less educated" as those with 12 or less years of formal education. Since there is no evidence of the "cohesion" of this group with respect to "its attitudes or ideas or experience," which "cannot be adequately represented if the group is excluded from the jury selection process," we conclude that the less educated do not constitute a "cognizable" group. Nor does defendant

---

[6]The delineation of these groups is that of defendant.

[7]"A group to be 'cognizable' . . . must have a definite composition. . . . *there must be some factor which defines and limits the group.* A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected. Secondly, the group must have cohesion. *There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process.* Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of the juries hearing cases in which group members are involved. That is, *the group must have a community of interest which cannot be protected by the rest of the populace.*" (Italics added.)

articulate any reasons which would warrant an inference that the absence of the "less educated" prejudiced him in any way. We cannot conclude that the inclusion in the grand jury of the "less educated" would have led to a different evaluation of the evidence which was presented against defendant. We agree with the court in *United States* v. *Potter* (9th Cir. 1977) 552 F.2d 901, 905, that the interests of the less educated can be adequately protected by the remainder of the populace. We also note that the United States Supreme Court has expressly declared that states may impose educational requirements for jury service (*Carter* v. *Jury Commission,* 396 U.S. 320, 332 [24 L.Ed.2d 549, 558-559, 90 S.Ct. 518]).[8] We discern no unjustifiable motive on the part of the "selectors" in the instant case as the record indicates an intention to procure grand jurors capable of performing their roles as required by law.[9]

■ Similarly, individuals with "low incomes" do not form part of a "cognizable group" which, if underrepresented on the grand jury, will promote prejudice with respect to the defendant. Defendant here points to no evidence that would support a finding of such prejudice. The applicable definition of "cognizability," quoted above, requires in part that the low income group possess "characteristic factors which can be limited" as well as "a composition which does not shift arbitrarily from day to day." Obviously, these requirements were not met here since the characteristics that can be ascribed to households with an annual family income of less than $15,000 are limitless. For example, a household may be composed of one or more persons, with one or more children and other dependents, as well as a wide variety of expenses; in addition, the composition of the "low income" family group changes every time a person in the "household" leaves, dies or is either promoted or demoted with a resulting increase or diminution of "income." We conclude, therefore, that on the record before us, it would not be reasonable to

[8]We are also aware that recently in *People* v. *Wheeler, supra,* 22 Cal.3d at page 268, our Supreme Court quoted with approval from *Glasser* v. *United States,* 315 U.S. 60 [86 L.Ed. 680, 62 S.Ct. 457], that good motive " '. . . must not blind us to the dangers of allowing any encroachment whatsoever on the essential right [to a trial by a representative cross-section of the community].' " We believe that the import of this language is restricted to cases where the "good motives" on the part of the jury "selectors" become an "excuse" for purposefully discriminating against an otherwise cognizable group and also to cases where the "good motives" have not been explicitly recognized.

[9]The record indicates that the first of the selectors who testified on the motion to quash the indictment stated that he sought individuals who could fulfill the role of a grand juror in the most impartial and unbiased manner, and specifically noted that the two individuals he recommended as prospective jurors were members of minority groups. When asked whether he thought certain groups were less qualified to fulfill this role, he replied in the negative and stated that the representation of members of these groups on the grand jury was indeed a favorable objective.

conclude that the composition of this group does not shift from day to day. Thus, "households with family incomes of less than $15,000" does not designate a sector within the community with views so unique that it cannot be adequately represented by those persons on the 1974 Santa Clara Grand Jury panel, with higher incomes, or which, even if not represented, would create an inherent bias in the jury's perception of the evidence.[10]

■ As to persons who comprise the group described by defendant as "blue collar workers," we believe that this category is even more vague and ambiguous than that composed of "low income family households." Recently, we responded to an identical claim by noting that the "designation of blue-collar workers is too imprecise and overinclusive" and that "It is common knowledge that many workers in craft occupations earn high incomes, well in excess of incomes earned by certain so-called 'white collar workers.' " (*People* v. *Navarette*,[11] *supra*, 54 Cal.App.3d at p. 1077; *Quadra* v. *Superior Ct. of the City & Cty. of San Francisco* (N.D.Cal. 1975) 403 F.Supp. 486; *State* v. *Forer* (1969) 104 N.J.Super. 481 [250 A.2d 431]). In the instant case, defendant's attempt to delineate the actual composition and common characteristics of "blue collar workers" has met with the usual circuity, namely, the definition provided remains irrelevant for the purposes of designating a group, the exclusion of which necessarily undermines the impartial function of the grand jury.[12] Specifically, the question which remains is: What attitudes, types of ideas and particular experiences would lead a "blue collar worker" to perceive the evidence of the defendant's guilt differently than a white, pink or black collar worker?

---

[10]Of course, we do not mean to imply that the proper kind of data could not be gathered to delineate a constitutionally cognizable group based on family income, and our Supreme Court so intimated in *People* v. *Wheeler, supra,* 22 Cal.3d 258. We are aware of family income used by a variety of governmental agencies to determine eligibility for various kinds of benefits. Defendant here, however, did not adduce any sufficiently refined income data but merely relied on the general census data.

[11]Since we decided *Navarette* in 1976, the inaccuracy of the designation "blue collar workers" has been demonstrated further by recent works indicating the existence of the "pink collar worker," i.e., the 7 out of 10 women who work full time in the lower paid and sexually segregated job market as retail clericals, waitresses, beauticians, retail salespersons and similar service industries (see Howe, Pink Collar Workers, (G. P. Putnam's Sons 1977) pp. 16, 21-22, 279-289).

[12]For example, defendant has pointed to the testimony of a witness who states that "blue-collar workers possess a basic similarity of attitudes, ideas or experience," and that "they are different in terms of values, attitudes, [and] life styles." Nowhere does defendant point to evidence or facts to substantiate the witness' conclusions.

As to the "young adult" group that defendant claims was improperly excluded from the 1974 Santa Clara Grand Jury, he contends that this group, comprised of those between the ages of 18 and 29, constitutes an identifiable class with such similarity of ideas, attitudes and experience that its exclusion prevented the 1974 grand jury from reflecting a cross-section of the community.

Defendant relies on *United States* v. *Butera* (1st Cir. 1970) 420 F.2d 564, 570. In *Butera,* the court indicated that it could not "close our eyes to the contemporary national preoccupation with a 'generation gap,' which creates the impression that the attitudes of young adults are in some sense distinct from those of older adults" and that the ". . . apparent distinctness is sufficient to say that neither class could be excluded from jury pools without some justification."

We do not find *Butera, supra,* persuasive. A mere "impression" of the difference in attitudes between "young adults" and "older adults," as well as their "apparent distinctness," without more, is an assertion of the obvious, as is the fact that a "generation gap" exists. Both *Butera,* as well as defendant's own attempt to define more precisely the group comprised of "young adults," still leaves us without the substantive evidence in the record to support defendant's claim that a difference in attitude exists, which if not represented on the grand jury would result in prejudice to him. In any event, as we indicated above the states may prescribe reasonable age and educational qualifications for their jurors (*Carter* v. *Jury Commission, supra,* 396 U.S. p. 322 [24 L.Ed.2d p. 553]). We conclude, therefore, that defendant's contention as to the improper exclusion of the "young adult" group does not meet the applicable criteria of "cognizability."

As we have concluded that the "low income" "blue collar" and "young adult" groups which defendant asserts were improperly excluded in the selection of his 1974 Santa Clara Grand Jury are not "cognizable," we need not discuss in detail whether our Supreme Court's recent decision in *People* v. *Wheeler, supra,* 22 Cal.3d 258, requires a different conclusion, as defendant argues.

We note that in *Wheeler,* our Supreme Court recognized that ". . . in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition . . . that it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or

even deep-rooted biases derived from their life experiences in such groups . . ." (p. 266). Thus, our Supreme Court's conception of the problem which the exclusion of certain groups may provoke, is premised on the same concerns as *United States* v. *Guzman, supra,* 337 F.Supp. pp. 143-144 (discussed above) to define cognizability as "[a] group to be 'cognizable' . . . there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. . . . [it] must have a community of interest which cannot be protected by the rest of the populace." Thus, as defendant pointed out, in *Wheeler, supra,* our Supreme Court did not articulate a "new" concern, but rather one that has long been recognized and which we have used to determine that the groups here in issue were properly excluded.

■ The objective of impartiality in juries is best protected by avoiding the exclusion of members of "cognizable" groups. *Wheeler, supra,* 22 Cal.3d at page 280, reiterated this view in setting forth the requirements for initiating a challenge to the composition of a jury that the claimant *"must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule."*[13] (Italics added.) The court further held at page 277: *"Nor does it mean that a party will be entitled to a petit jury that proportionately represents every group in the community . . .* [adhering] to the long-settled rule that no litigant has the right to a jury that mirrors the demographic composition of the population, or necessarily includes . . . his own group . . . ." (Italics added.)[14] Inevitably, therefore, as long as a group does not fall within the definition of cognizability, we cannot sustain a claim of unconstitutionality which is premised on an allegation that such a group was excluded from the original list from which the jury panel is drawn.

---

[13]This view is not contradicted by the following language which our Supreme Court in *Wheeler, supra,* at page 268, quoted from *Thiel* v. *Southern Pacific Co., supra,* 328 U.S. 217, 220 [90 L.Ed. at page 1185]: " 'Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society . . .' " and that " '. . . [j]ury competence is an individual rather than a group or class matter.' " Contrary to defendant's assertion, we cannot analogize the instant record on the motion to quash the indictment to *Thiel* v. *Southern Pacific Co., supra,* which held that it is unconstitutional to deliberately and intentionally exclude from the jury lists all persons who worked for a daily wage. In *Thiel,* the group was specifically defined by those who were in fact responsible for the unconstitutional exclusion.

[14]Our Supreme Court further indicated in *Wheeler,* 22 Cal.3d at page 277, in reference to the fact that an individual is not entitled to a specific representation on the petit jury that *"a party is constitutionally entitled to a petit jury that is as near an approximation of the ideal cross-section of the community as the process of random draw permits"* (italics added).

In *Rubio* v. *Superior Court,* 24 Cal.3d 93 [154 Cal.Rptr. 734, 593 P.2d 595], the first case in which our Supreme Court interpreted *Wheeler,* the representative cross-section rule was reiterated and the court emphasized that a constitutionally cognizable group must "impart . . . a common social or psychological outlook on human events" (*id.,* p. 98). Thus, *Rubio* supports our view that *Wheeler* did not relax the definition of cognizability with respect to groups that are not delineated by either race, sex, ethnicity or religion in such a manner as to require a different result in the case at bar. We are led also to this conclusion by the identical considerations and rationale that we applied in *People* v. *Navarette, supra,* 54 Cal.App.3d 1064. In *Navarette,* we declined standing to a claim of violation of the representative cross-section rule, notwithstanding our finding that a cognizable group composed of the women in the community was grossly underrepresented on the grand jury under scrutiny there. There, as in the instant case, the law which was in effect during the selection and impanelment of that grand jury—and upon which the "selectors" relied—did not recognize the group comprised of women as "cognizable." We held that a challenge to the composition of the grand jury on grounds that the group comprised of women had been unconstitutionally excluded, can only be made to juries impaneled *after* the effective date of the case, which recognized the cognizability of that group, namely, *Taylor* v. *Louisiana, supra,* 419 U.S. 522. ■ ■■
We made a similar decision with respect to the right to challenge a violation of the representative cross-section rule on the grounds that there exists "de facto" discrimination which stems from "negligence or inertia" rather than systematic, purposeful discrimination, noting that the decision which allows a claim of unconstitutionality with respect to the impanel-ment of a jury even without "discriminatory design" (*People* v. *Superior Court (Dean),* 38 Cal.App.3d 966 [113 Cal.Rptr. 732], was not in effect when the grand juries under scrutiny here and in *Navarette* were selected.[15]

We are aware of our Supreme Court's language on page 285 in *Wheeler, supra,* which stated that ". . . in California each and every defendant—not merely the last in this artificial sequence—is constitution-

---

[15]We note here that the male defendant in *Navarette, supra,* 54 Cal.App.3d 1064, did have standing to claim that women were excluded from the grand jury in violation of the representative cross-section rule (*Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163]). Still, he was unsuccessful in his contention for the reasons set forth above regarding the restricted prospective recognition of "women" as a cognizable group.

Thus, in the instant case, defendant has standing to claim that "young adults" have been excluded, even though he was 36 years old at the time of trial and, therefore, not a member of that group.

ally entitled to a trial by a jury drawn from a representative cross-section of the community." Contrary to defendant's assertion that the rule applies to all appeals pending when *Wheeler* was decided, our Supreme Court indicated that a very narrow application would be made limited to a narrow class within the unique facts of *Wheeler*. The court specified at footnote 31 on page 283, that the *Wheeler* rule would not be applied retroactively, but would apply *only* to Wheeler a companion matter, and to any defendants under sentence of death; as to all other cases, the rule is limited to the proceedings *taking place after the effective date of Wheeler* (Sept. 25, 1978).

In sum, we have concluded that the groups which defendant claims were improperly excluded from his grand jury panel are not constitutionally "cognizable" and that even if we were to assume that Wheeler made them so, this recognition would be applied prospectively only. Accordingly, we need not address either the questions of intentional discrimination on the part of the superior court judges who selected the 1974 Santa Clara Grand Jury, or the question of whether defendant was wrongfully precluded from submitting evidence which would establish a prima facie case of systematic intentional discrimination in the selection of the jury.[16] In the absence of a "cognizable" group at whom the unconstitutional practices are directed, no such improprieties can exist. We can only conclude, therefore, that on the basis of the record before us the trial court's denial of the motion to quash the indictment against defendant was proper, since the grand jury which issued that indictment was not unconstitutionally selected.

Defendant next contends that his Penal Code section 1538.5 motion was improperly denied, as certain items which were introduced as evidence were obtained by an unlawful search and seizure. He asserts

[16]We are aware that in *Duren v. Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664], the U.S. Supreme Court reiterated the requirements of the representative cross-section rule, namely, that: 1) the allegedly excluded group must be "distinctive"; 2) the underrepresentation must be proved and established, and that the underrepresentation must be due to systematic exclusion of the group in the jury process (p. 363-367 [58 L.Ed.2d p. 588]). *Duren* is readily distinguishable from the instant case as there the systematically excluded group was composed of women, a group that satisfies the requirement of "cognizability." We also note that (at p. 364-367 [58 L.Ed.2d p. 588]), the court held that a statistical showing by *Duren* that 26.7 percent of those persons summoned from the jury wheel, and 14.5 percent of the persons on the postsummons weekly venires were women, while 54 percent of the adults in the forum community were women, constituted a sufficient prima facie case for it to conclude that the jury venire containing about 15 percent women was not "reasonably representative." Pursuant to *Duren,* the statistical evidence submitted by defendant might have had a prima facie case if the groups which defendant claimed were excluded had been legally "cognizable" or "distinctive groups."

that the search warrant was issued without sufficient foundational circumstances as would reasonably lead a magistrate to conclude that probable cause existed to search his residence and without sufficient foundational facts from which a magistrate could reasonably conclude that the premises described in the affidavit were defendant's.

A search warrant is legally sufficient when the affidavits upon which it is based disclose competent evidence to lead a man of ordinary prudence and caution to believe and conscientiously to entertain a strong suspicion that property subject to seizure will be found in the place for which the warrant is sought (*People* v. *Superior Court (Brown)*, 49 Cal.App.3d 160, 165 [122 Cal.Rptr. 459], and citations).

Here, there is no doubt that the above standard was met since the affidavit contained sufficient foundational circumstances to support its validity. Contrary to defendant's contention, there is no question as to the findings and qualifications of the affiant, Sergeant Kelso, who had 11 years of experience as a police officer and in that capacity is presumed reliable in the official communication of matters within his direct knowledge (*People* v. *Superior Court (Brown)*, *supra*, 49 Cal.App.3d, p. 167). In addition to the information relating the known circumstances of the victim's death, the affidavit stated: 1) defendant's wife had filed for a dissolution of their marriage for which defendant had received a summons; 2) defendant made threats against the life of his estranged wife and "her people"; 3) defendant possessed a bayonet with approximately the same dimensions as the murder weapon; 4) defendant's hair was the same color as that of the stray hairs found on the body of the deceased; 5) defendant left work early on the day of the murder; and 6) defendant's estranged wife "informed . . . [the affiant] that she moved with her minor child from the family residence at [the address authorized for search under the warrant] . . . on the day of the murder." On the basis of the above facts, the magistrate logically and reasonably believed that defendant resided at the premises designated in the warrant and that personal items, such as clothing, hair brushes and combs[17] as well as the bayonet[18] which he usually carried with him, would probably be found. We conclude that defendant's section 1538.5 motion was properly denied.

[17]Defendant's reliance on *In re Jean M.*, 16 Cal.App.3d 96 [93 Cal.Rptr. 679], and *Aguilar* v. *Texas*, 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], for the proposition that the affiant improperly relied on the hearsay information of an informant is inapposite here since no confidential informant is involved, but rather a citizen-informant.

[18]Defendant's contention that the bayonet was improperly included in the warrant to search his home need not be addressed here since ultimately no knife was seized, rendering moot the question of the sufficiency of the affidavit on that issue.

■ Defendant next contends that the trial court abused its discretion by depriving him of his right to "reasonable examination" of the prospective jurors (Pen. Code, § 1078). He argues that the trial court impermissibly limited the voir dire on the "presumption of innocence" (see Pen. Code, § 1096) and thereby precluded him from exercising "an intelligent . . . challenge for cause of a juror unwilling to apply the presumption."

The record does not support defendant's contention. Rather, it merely indicates that defense counsel was precluded from asking a single question: "As the defendant sits here now, do you presume him to be innocent?" Further, the record indicates that prior to the selection of the jury, both counsel were informed that the court would voir dire the prospective jurors collectively as to their understanding of the "presumption of innocence," and that it would not permit counsel to probe that specific area. The record also indicates that, in fact, the court not only voir dired the prospective jurors properly and sufficiently, but simultaneously fulfilled its " '. . . duty . . . to restrict the examination of jurors within reasonable bounds so as to expedite the trial' " (*People* v. *Crowe,* 8 Cal.3d 815, 828, fn. 22 [106 Cal.Rptr. 369, 506 P.2d 193], quoting from *People* v. *Semone,* 140 Cal.App. 318, 326 [35 P.2d 379]). In light of the extensive and pertinent questioning which occurred and the reasonableness of the trial court's limitation, we cannot conclude that defendant was denied the right to a reasonable examination of the prospective jurors.

Defendant next maintains that the trial court improperly admitted into evidence tapes of his conversations with his sister and brother-in-law. Both of these conversations were monitored and recorded during visits defendant received at the county jail.

■ Defendant asserts that the admission of these items violated his Fourth Amendment rights, the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520), his right to privacy under the California Constitution (art. I, § 1), and the California Invasion of Privacy Act (Pen. Code, §§ 630-637.2). He also contends that the tape of his conversation with his brother-in-law was improperly authenticated.

The above federal and state constitutional provisions apply only where the parties to the communication have a "reasonable expectation of privacy" with respect to what is said (*Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]). Similarly, the protection afforded by the above statutes which prohibit the introduction into evidence of certain

conversations, applies only to communications "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation" (18 U.S.C. § 2510(2), § 2511), or to a communication that is intended to be "confidential" (Pen. Code, § 632, subd. (a)).

Consequently, in light of the fact that the protections invoked by defendant are conditioned upon his ability to show that he had reason to believe his communications were confidential and would remain private, his inability to do so compels a finding that no statutory or constitutional violation occurred. Both the evidence presented and well established case law preclude any assertion of a reasonable expectation of privacy. Defendant purposely and deliberately told his sister during their first visit that their conversation was being recorded. He also spoke to her in a manner which was not common between them, and therefore demonstrated that circumstances were such that others could easily overhear—which is a strong indication that the communication was not intended to be confidential (*North* v. *Superior Court,* 8 Cal.3d 301, 311-312 [104 Cal.Rptr. 833, 502 P.2d 1305, 75 A.L.R.3d 155]; *People* v. *Santos,* 26 Cal.App.3d 397, 402 [102 Cal.Rptr. 678]). Nor could such an expectation exist since it is well settled and understood that incarcerated persons have no reasonable expectation of privacy with respect to their conversations (*People* v. *Martinez,* 82 Cal.App.3d 1, 15 [147 Cal.Rptr. 208]; *People* v. *Hill,* 12 Cal.3d 731 [117 Cal.Rptr. 393, 528 P.2d 1]; *North* v. *Superior Court, supra,* 8 Cal.3d 301; *In re Joseph A.,* 30 Cal.App.3d 880 [106 Cal.Rptr. 729]).[19]

Defendant also maintains that pursuant to Penal Code section 2600, prison and jailhouse officials are precluded from depriving their prisoners of any rights in the absence of specific institutional problems with security or discipline. Defendant relies on *In re Harrell,* 2 Cal.3d 675 [87 Cal.Rptr. 504, 470 P.2d 640], and *Yarish* v. *Nelson,* 27 Cal.App.3d 893 [104 Cal.Rptr. 205]. While the deprivation of a prisoner's rights or privileges requires penological objectives, the legitimacy of jailhouse monitoring of inmate conversations is based on precisely these objectives, and is in no way *restricted* to the maintenance of institutional security. Even assuming that in this case the security of the institution was not the interest of the officials in monitoring the instant conversations, a wide range of concerns remain to justify the imposition of certain restrictions

---

[19]The recognized exception to the rule is not applicable here since there was no attempt on the part of the jailhouse officials to "lull" the parties into believing their conversations would remain private (see *North* v. *Superior Court, supra,* 8 Cal.3d 301).

upon the rights of prisoners. These concerns include considerations "absolutely essential to the orderly administration of our penal system," such as prison discipline. Thus, communications between prisoners awaiting trial and certain classes of visitors may be regulated (*Yarish* v. *Nelson, supra,* p. 898).

■ Defendant further contends that the recording of his jailhouse conversation with his brother-in-law was introduced without a proper foundation, as it was improperly authenticated. This contention also is not supported by the record.

Dahl, the investigator from the district attorney's office who monitored the conversation in question, identified the tape as the same one on which he recorded the conversation. He testified that although he did not speak Spanish, the tape was a complete recording of the conversation. His testimony alone was sufficient to authenticate the tape pursuant to Evidence Code sections 250 and 1413. Evidence Code section 250 defines "writing" to include a tape recording, and Evidence Code section 1413 provides that "A writing may be authenticated by anyone who saw the writing made or executed, including a subscribing witness" (*People* v. *Fonville,* 35 Cal.App.3d 693, 708 [111 Cal.Rptr. 53]). In addition, the translation of the tape reveals that defendant attempted to solicit an alibi from his brother-in-law, a request which could not reasonably have been forthcoming from anyone other than the individual who was aware of the circumstances which would support a favorable alibi. In effect, the conversation proves itself and, therefore, independently meets the requirements of Evidence Code section 1421 that the matters referred to in the writing be such as would make it "unlikely" that they be known to anyone other than the person claimed to be its author (see *People* v. *Fonville, supra*).

Accordingly, we can only conclude that the tape recordings as well as the transcripts of the conversations between defendant and his sister and brother-in-law were properly admitted into evidence. There was no violation of any reasonable expectation of privacy otherwise protected by the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520), the Fourth Amendment to the United States Constitution, the California Invasion of Privacy Act (Pen. Code, §§ 630-637.2), and section 1 of article I of the California Constitution. Nor was the monitoring and recording of defendant's jailhouse conversations a violation of Penal Code section 2600, since there was no deprivation of rights of an incarcerated person which was not justified by a legitimate penological objective.

■ Finally, defendant maintains that by refusing to grant his motion to correct the record on appeal (pursuant to rule 12 (b) and (c) of the California Rules of Court),[20] this court has abused its discretion and deprived him of his right to appeal. We cannot agree.

•

Rather, the record reveals an inexcusable delay by defendant in submitting his verified[21] statement setting forth the facts upon which his motion to correct the record was based. Defendant's motion was not filed until seven months after the appointment of his present counsel,[22] and two years and six months after defendant first received his copy of the record in May, 1975. Even assuming, as defendant contends, that his inability to comply with the time requirements of California Rules of Court, rule 8(a),[23] was due to circumstances beyond his control, he has not stated grounds for relief from his default.

Defendant, however, argues that because he has succeeded in showing with "some certainty" how materials allegedly not included in the transcripts may be useful to him on appeal, he is entitled to the correction. While we agree that defendant has satisfied the liberal standards for motions to augment established by *People* v. *Gaston,* 20

[20]Rule 12, California Rules of Court provides as follows: "(b) If any material part of the record is incorrect in any respect, or lacks proper certification, the reviewing court, on suggestion of any party or on its own motion, may direct that it be corrected or certified."

"(c) The reviewing court may submit to the superior court for settlement any differences of the parties with respect to alleged omissions or errors in the record, and the superior court shall make the record conform to the truth. The reviewing court may also direct that omissions or errors be corrected pursuant to the stipulation of the parties filed with the clerk of that court."

[21]The record indicates that pursuant to a letter dated June 3, 1975, the clerk of this court informed defendant of the fact that any motion or petition would have to be in the form of a *verified* statement of declaration.

[22]Counsel was appointed to represent defendant on August 19, 1975; this appointment was vacated, however, and a second appointment was made in accordance with defendant's request. On March 28, 1977, the second appointment was also vacated and the state public defender was appointed to represent defendant; he remains his counsel.

[23]Rule 8 of the California Rules of Court provides: "(a) Immediately on the completion of the clerk's and reporter's transcripts the clerk shall mail notice thereof to all parties, and *within 10 days after mailing of such notice, any party may file a request for correction of such transcripts.* If no request for correction is filed within such time, the clerk shall certify the record as correct" (italics added).

We note here that rule 35(c) of the California Rules of Court regarding certification of transcripts in criminal cases, requires that the transcript be "delivered" to the parties, and the 10-day period for filing notice of error begins as of the day of the "delivery." It is of no consequence, however, that neither the court below which certified the record nor the clerk of this court noticed the error in referring to rule 8(a) rather than to rule 35(c) (in both the certification and correspondence) because defendant's resulting delay was inexcusable in any event.

Cal.3d 476 [143 Cal.Rptr. 205, 573 P.2d 423], and *People* v. *Silva,* 20 Cal.3d 489 [143 Cal.Rptr. 212, 573 P.2d 430], neither case involved a "correction" or an "inexcusable delay." In any event, here, defendant has failed to show how any error on our part in refusing to grant his motion to correct has prejudiced or denied him his right to an effective appeal. We conclude, therefore, in accordance with *People* v. *Watson,* 46 Cal.2d 818, 837 [299 P.2d 243], that it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of any error on our part insofar as we refused to grant defendant's motion to correct the record on appeal.

Accordingly, even assuming without conceding that defendant's various contentions regarding possible error in the proceedings below have some merit, we believe the evidence adduced at the trial is so overwhelming as to his guilt that any existing error was harmless beyond a reasonable doubt and that his substantial rights were not affected (*Chapman* v. *California,* 386 U.S. 18, 22-24 [17 L.Ed.2d 705, 709-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]).

The judgment is affirmed.

Kane, J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 12, 1979. Bird, C. J., did not participate therein.