335 A.2d 897 (1975)
STATE of Maine
v.
Frank CLAPP, III.
Supreme Judicial Court of Maine.
April 16, 1975.
*899 Thomas E. Delahanty, II, County Atty., Auburn, for plaintiff.
Gaston M. Dumais, Lewiston, for defendant.
Before DUFRESNE, C. J., and WEATHERBEE, WERNICK and ARCHIBALD, JJ.
WERNICK, Justice
On January 9, 1974 defendant, Frank Clapp III, was indicted for having sold, on August 30, 1973 at Lisbon, Maine, ". . . D-Lysergic Acid Diethylamide (LSD) . . ." in violation of 22 M. R.S.A. § 2212-E. The indictment contained two counts, the first alleging a sale to one Michael Hall and the second a sale to one Thomas Hawkes. Hall and Hawkes were undercover agents of the Narcotics Unit of the Lewiston Police Department.
A two-day jury trial in the Superior Court (Androscoggin County) culminated in a verdict, returned on March 28, 1974, that defendant was guilty as charged. Defendant has appealed from the judgment of conviction and asserts several grounds for reversal.
Two pertain to pre-trial matters: (1) by delaying the indictment of defendant for slightly more than four months after the State knew of the grounds to charge defendant, the State deprived defendant of "due process of law" in contravention of the 5th-14th Amendments to the Constitution of the United States;[1] (2) the State's systematic exclusion from the jury pool of persons who were incapable of being "certified" as "voters" because they had failed to register[2] was a violation of Article I, Section 6 of the Constitution of Maine guaranteeing defendant an ". . . impartial trial . . . by a jury of the vicinity."
Both claims lack merit.
Concerning the State's delay in bringing an indictment defendant relies upon Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965). Ross was not a decision on constitutional grounds but was the appellate court's exercise of a supervisory authority over criminal prosecutions. As an exercise of "supervisory responsibility" aimed at
"reconciliation of the competing needs of effective law enforcement and early notice to the accused-to-be of the impending accusation . . ." see: Robinson v. United States, 148 U.S.App.D.C. 58, 459 F.2d 847, 851 (1972),
Ross has been strictly confined to its special facts comprising:
"(1) a purposeful delay of seven months between offense and arrest, (2) a plausible claim [by defendant] of inability to recall or reconstruct the events. . ., and (3) . . . the [State's] case . . . [as] consist[ing] of the *900 recollection of one witness refreshed by a notebook." (p. 215 of 349 F.2d)
In Jackson v. United States, 122 U.S. App.D.C. 124, 351 F.2d 821 (1965) the Court clarified that actual prejudice to defendant was a critical feature of Ross. Jackson further stressed that although there can be delays sufficiently long to create a "presumption" of prejudice, in general such presumption will not arise from a delay of five months. Also: Powell v. United States, 122 U.S.App.D.C. 229, 352 F.2d 705 (1965); Worthy v. United States, 122 U.S. App.D.C. 242, 352 F.2d 718 (1965); Robinson v. United States, supra.
Here, there is no plausible claim of an inability of defendant to recall or reconstruct the events involved in the offenses charged against him. Defendant testified fully concerning the matters charged by the indictment and at no time professed significant (if any) lack of recollection as to details (see Robinson v. United States, supra, at p. 852). In addition, since the State's delay in indicting was only slightly more than four months, there is no "presumption" of prejudice, and defendant failed to come forward with facts tending to show actual prejudice.
Thus, even under the "supervisory responsibility" approach of the United States Court of Appeals for the District of Columbia the instant conviction would stand. A fortiori, defendant must be held to have failed in his effort to establish a violation of constitutional "due process" as predicated on the State's delay in indicting him.
Also unfounded is defendant's contention that the establishment of the "jury pool" violated Article I, Section 6 of the Constitution of Maine insofar as 14 M.R.S.A. § 1254 prescribes that only the names of "voters duly certified" shall be placed in the "master jury wheel" from which the Jury Commissioners
"draw . . . the names of as many persons as may be required for jury service at the prospective term,. . . ." 14 M.R.S.A. § 1255
We are mindful that, recently, the Supreme Court of the United Statescrystallizing as a definitive decision "the unmistakable import of . . . [its] opinions, at least since 1941"has held that
". . . the selection of a petit jury from a representative cross section of the community is an essential component of the [federal] Sixth Amendment right to a jury trial." Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)
Since the Sixth Amendment has been incorporated into the "due process clause" of the federal Fourteenth Amendment, this "fair cross section" requirement controls the selection of juries in State criminal prosecutions, Taylor v. Louisiana, supra, and becomes automatically absorbed into the guarantee of jury trial embodied in Article I, Section 6 of the Constitution of Maine.
Defendant thus commences with a correct major premise that the
". . . American concept of the jury trial contemplates a jury drawn from a fair cross section of the community" Taylor v. Louisiana, supra, p. 527, 95 S. Ct. p. 696
and, hence, systematically
"[r]estricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." Taylor v. Louisiana, supra, p. 530, 95 S.Ct. p. 698.
Defendant, however, can gain nothing from the application of his premise, correct though it be in the abstract, to the instant case. Here, the record fails to support the conclusion that in fact
"identifiable segments playing major roles in the community . . ." *901 have been systematically excluded from the "jury pool."
Defendant's contention is that confining the jury pool to persons who have chosen to register as voters
"amounts to a purposeful exclusion. . . of . . . social groups which do not choose to register and vote." (emphasis supplied)
This argument begs the question. It is not evident in advance as a logical necessity, and we cannot notice judicially, that the individuals who fail to register fall into patterns of identifiable social groupings. Defendant can prevail in his contention only by an evidentiary showing that the individuals who do not register to vote share in common, over and above their failure to register, features which mark them as a substantial segment of the general populace playing a major, and distinctively class (or group), role in the life of the community. Taylor v. Louisiana, supra; see: State v. Townsend, Conn. (1975).
We have before us no such evidence and, therefore, must reject defendant's claim that the "fair cross section of the community" requirement of the jury trial guarantee of Article I, Section 6 of the Constitution of Maine was here violated by Maine's current jury selection system.
Defendant's other points of appeal concern alleged errors in rulings made by the presiding Justice at the trial.
Defendant says that one such error was the refusal of the presiding Justice to strike the opinion testimony of a witness, duly qualified as an expert in chemistry and the identification of chemical substances, affirming that the tablets allegedly sold by defendant contained "d-lysergic acid diethylamide" (D-LSD). To support this claim defendant relies upon a testimonial concession by the expert witness that the chemical tests he had performed were incapable of differentiating the "D" from the "L" form of LSD.[3]
The distinction between the two forms is critical in the instant case, says defendant, since the indictment went beyond charging that defendant sold merely "LSD" and specifically alleged that defendant sold "D"(dextro) LSD. Defendant maintains that the failure of the chemical tests definitively to differentiate "D" (dextro) from "L" (levo) LSD undermines the opinion of the chemist that the tablets tested contained "D" (dextro) LSD, with the consequence that the presiding Justice erred in refusing to strike this opinion which had strong tendency to influence the jury against defendant.
The argument is unconvincing. It fails because it rests on the premise that the results of chemical tests constitute the *902 sole basis upon which an expert in the identification of chemical substances may arrive at an expert opinion as to the identity of a given substance. The premise is erroneous since the law allows such expert to utilize, in addition to chemical tests he performs, information he has acquired in the course of his activities and which in his expert judgment he deems accurate and supportive of his ultimate conclusions.
Here, the record is clear that the expert witness had available, beyond the results of the chemical tests, information considered by him accurate and beneficial, and he made use of this information to arrive at his ultimate expert opinion as to the identity of the chemical substance contained in the tablets at issue.
The chemist testified that in the performance of his work as an expert in the identification of chemical substances he had learned, and considered accurate, the following information. There are two sources of LSD. One is the "naturally occurring" ergot found in wheat rust. This "naturally occurring" ergot is easily extracted and can, without difficulty, be cooked with acids and otherwise treated to yield LSD. All LSD produced from this "naturally occurring" ergot is of the "D" (dextro) form. The other basic source of LSD is a synthetic ergot derived from a "great long surge of complicated chemical" procedures. Synthetic ergot can also be treated to yield LSD. LSD derived from synthetic "ergot" is a mixture of both the "D" (dextro) and the "L" (levo) forms. While not impossible, it is extremely difficult to extract from the LSD derived from synthetic "ergot" (as containing a mixture of the "D" and "L" forms) the pure "L" form of LSD.
Relying on the foregoing facts, the chemist testified that it was his expert conclusion that the great difficulty and high cost of producing the pure "L" form of LSD makes it ". . . extremely unlikely that there is any pure [L]-lysergic acid diethylamideLSD circulating."
Thus, on the basis of information acquired within the scope of his expertise, the expert witness was himself convinced beyond a reasonable doubt (if not to an absolute certainty) that LSD in common circulation is not the pure "L" form but contains some of the "D" form. Utilizing this fact in combination with results of the chemical tests he had performed, as showing that the tablets at issue contained LSD, the chemist arrived at an ultimate expert opinion that the tablets here at issue contained the "D" (dextro) form of LSD.
It was unquestionably proper for the chemist, as a qualified expert in the identification of chemical substances, to assist the jury by giving them his expert opinions on the highly technical matter of the identification of the chemical substance at issue in this case. That the chemist, as an expert, arrived at his opinion by utilizing information other than the results of the chemical tests he had performed did not invalidate his opinion testimony. Since the other information was of the kind likely to be acquired and assessed for accuracy by persons expert in the identification of chemical substances, it was appropriately utilizable by the expert to assist him in affording to the jury the benefit of his expertise concerning matters on which the jury needed the guidance of experts.
Moreover, in the present situation the expert explained in detail to the jury both the subsidiary facts on which he relied to support his opinions and the manner in which he had utilized those facts to reach his ultimate conclusions. With the underlying information and its role in the expert's reasoning process thus fully exposed to the jury, the jury had full opportunity to evaluate for itself (1) whether it was satisfied beyond a reasonable doubt of the accuracy of the subsidiary facts utilized by the expert, and (2) whether it agreed with the reasoning process by which the chemist had arrived at his opinions.
*903 The presiding Justice acted without error in declining to strike the testimony of the witness, qualified as an expert in the identification of chemical substances, that in his opinion the tablets sold by defendant contained the "D-(dextro)" form of LSD.
Defendant complains that the presiding Justice committed reversible error in denying defendant's motion for judgment of acquittal. Since, however, defendant supports this claim by reaffirming his belief that the chemist's testimony identifying the tablets as the "D" (dextro) form of LSD was wrongly allowed to remain in evidence, our decision holding this evidence admissible simultaneously refutes defendant's contention that he should have been awarded a judgment of acquittal. With the admissibility of the chemist's testimony established, there was sufficient evidence to authorize a jury conclusion beyond a reasonable doubt that, as charged in the indictment, the tablets sold by defendant contained LSD of the "D" form.[4]
We dispose of defendant's three remaining points of appeal with less extended discussion.
Detective Roy Perham, Supervisor of the Narcotics Unit of the Lewiston Police Department was called as a witness for the State. On direct examination he explained his role in the police efforts to keep continuous custody and control of the alleged contraband from the time it was seized until it was delivered to the chemist for analysis. On cross-examination counsel for the defendant sought to have Perham produce records showing the reimbursements to the undercover agents of the monies expended by them to make the purchases from the defendant. Defendant complains on appeal that the presiding Justice erred in shutting off this line of questioning.
We find no error by the presiding Justice. The minimal probative potential of the evidence defense counsel was seeking to introduce was overborne by its heavy countervailing tendency to inject extraneous considerations likely to impede the orderly and expeditious course of the trial. The ruling of the presiding Justice was a legitimate exercise of his discretion to confine the cross-examination within appropriate limits. Isaacson v. Husson College, Me., 332 A.2d 757 (1975); Towle v. Aube, Me., 310 A.2d 259 (1973); State v. Bennett, 158 Me. 109, 179 A.2d 812 (1962).
Upon the request of the defendant the presiding Justice ordered that the undercover agents who were to be witnesses for the State should be sequestered during the presentation of evidence. The presiding Justice refused to grant a further request of defendant that sequestration continue during closing arguments to the jury.
Defendant's claim that this ruling constituted reversible error is patently without merit. Sequestration of witnesses is generally within the discretion of the presiding Justice and can be ground for reversal only upon a showing that discretion has been abused. State v. Fernald, Me., 248 A.2d 754 (1968). Here, the sequestration during the taking of evidence fulfilled the primary objective of sequestration:avoidance of the likelihood that the testimony of one witness may influence other witnesses, see: State v. Cloutier, Me., 302 A.2d 84, 90 (1973).
Defendant says that sequestration during closing arguments of counsel should have been ordered to preclude the likelihood that the exposure of the "clean cut" appearance of the government agents to the jury during the prosecutor's closing argument *904 would unduly influence the jurors to accept the prosecutor's argument urging the jury to give credence to the undercover agents rather than the defendant.
Defendant's contention is patently unacceptable. The "clean cut" appearance of the agents was abundantly before the jury when the agents testified on the State's behalf. The credibility impact resulting from their appearance was thus already achieved sufficiently to render "de minimis" any additional influence upon the jury resulting from the presence of the agents during the prosecutor's closing argument. The ruling of the presiding Justice was a valid exercise, rather than an abuse, of discretion.
Defendant's last point on appeal asserts error in the refusal of the presiding Justice to amplify his charge with an instruction specifically requested by defendant that:
". . . furnishing doesn't necessarily amount to a sale. Just because someone is willing to purchase doesn't make one guilty of a sale. . . . there must be. . . evidence that the Defendant knew that it was LSD, . . . the same LSD that is prohibit[ed] under the statute."
The ruling of the presiding Justice was proper. Virtually unanimous is the current of authority that a defendant may not be convicted of the crime of selling a narcotic drug (in violation of a statute such as 22 M.R.S.A. § 2212-E) without proof by the State that the defendant believed he was selling a substance "narcotic" in "character." Appropriate cases are collected in Annot. 91 A.L.R.2d 810, 821, et seq. State v. Gellers, Me., 282 A.2d 173, 178 (1971) indicates that Maine law follows this approach. It is not requisite under this principle, however, that defendant also entertain a belief as to the exact identity of the drug being sold and that statute prohibits the sale of it as such a particularly identified drug.
Insofar as the instruction tendered by defendant requested the presiding Justice to charge the jury that
"there must be . . . evidence that the Defendant knew that it was LSD,. . . the same LSD that is prohibit[ed] under the statute"
defendant proffered an erroneous statement of the law, and the presiding Justice correctly refused to give it to the jury.
The entry is:
Appeal denied.
POMEROY and DELAHANTY, JJ., did not sit.
All Justices concurring.
NOTES
[1] Defendant makes no contention of a violation of the federal Sixth Amendment guarantee of a right to speedy trial insofar as the Sixth Amendment is binding on the States by incorporation into the "due process of laws" clause of the federal Fourteenth Amendment. Apparently, defendant recognizes that United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) has settled that such claim would fail.
[2] The exclusion occurs pursuant to the provisions of 14 M.R.S.A. §§ 1254, 1255.
[3] The expert had explained that LSD occurs in two distinct forms, one identified as "D-LSD" and the other as "L-LSD"the difference being cognizable insofar as under viewing by polarized light LSD can make the plane of light rotate in opposite directions. This effect is conceived to arise because the molecular composition of LSD takes "mirrorimage" forms which, by reference to the rotational directions of the plane of polarized light, are designated "dextro"-LSD and "levo"-LSD, for short, "D"-LSD and "L"-LSD.

Molecular form differentiation arising from the rotatory effects of a substance on a plane of polarized light is explained in detail in March, Advanced Organic Chemistry: Reactions, Mechanisms and Structure (1st Ed. 1968) in a section entitled: "Optical Isomerism and Optical Activity". The text states:
". . . A material which rotates the plane of polarized light is said to be optically active. If a pure compound is optically active, . . . the molecule is nonsuperimposable on its mirror image . . . .
". . . in each case of optical activity of a pure compound there are two and only two isomers, called enantiomers,. . . ." (p. 71)
In Weininger, Contemporary Organic Chemistry (1st Ed. 1972) it is said:
"The left-and right-handed forms of an asymmetric molecule are enantiomers . . . enantiomers are also known as optical isomers . . . ." (p. 143)
[4] Because of this conclusion we need not here decide, and we intimate no opinion concerning: (1) whether 22 M.R.S.A. § 2212-Eincorporating by reference Section 2212-B,notwithstanding the statute's explicit delineation of "D-lysergic acid diethylamide" and by virtue of its specific inclusion of "optical isomers", outlaws sale of the "L" as well as the "D" form of lysergic acid diethylamide, or (2) if the sale of both forms is made a crime, whether in an indictment charging specifically that the "D" form of LSD was sold the reference to the "D" form may be treated as surplusage.