STATE of Maine

v.

Linda M. ANAYA.

Supreme Judicial Court of Maine.

Argued Nov. 6, 1981.

Decided Dec. 29, 1981.

Charles K. Leadbetter, Anita St. Onge (orally), Wayne S. Moss, Herbert Bunker, Asst. Attys. Gen., Augusta, for plaintiff.

Nisbet, MacNichol & Ludwig, Francis M. Jackson (orally), South Portland, for defendant.

Before McKUSICK, C. J., and GOD-FREY, NICHOLS, CARTER, VIOLETTE and WATHEN, JJ.

WATHEN, Justice.

In the Superior Court (Cumberland County), defendant Linda Anaya was found guilty of manslaughter, 17–A M.R.S.A. § 203 (Supp. 1981). Her appeal from this jury verdict assigns numerous claims of error. Since we find that the presiding justice committed reversible error in excluding testimony relating to the "battered wife syndrome," we sustain the appeal and vacate the judgment of conviction.

I.

On April 9, 1980, shortly after midnight, Brunswick Police responded to a report of a stabbing at the defendant's apartment. They found Frank Williams, defendant's lover, lying on the floor unconscious while

defendant stroked his head and talked to him. He died shortly thereafter. The cause of death was determined to be a knife wound in the back which severed the aorta. The evidence proving that defendant stabbed the deceased was overwhelming and she has not contested this fact on appeal.

Frank Williams moved into defendant's apartment in mid-November, 1979, approximately five months before his death. In December, soon after Williams moved out of the apartment, Linda Anaya cut her wrists and was treated at the local hospital. Williams returned to the apartment the next day.

On February 7, 1980, defendant's roommate, Pam Davis, called the police twice to intervene in domestic problems. First, Frank Williams cut his wrists and Davis called for help, but he refused it, saying "Aren't I cute?" Later on during that evening, Davis apparently called the police again because Williams had pushed and kicked the defendant and held a knife to defendant's throat, threatening to kill her. He had also chased Davis while threatening her with a hammer. At some point, Williams received a knife wound in the back and claimed that defendant had stabbed him. Defendant received some bruises and, according to Davis, had to be treated for a concussion.

In March, 1980, defendant was treated for face and head injuries caused by Frank Williams. Life at the apartment was "like a madhouse" at this time. Williams had threatened to kill defendant if she left him and she appeared to be frightened. At the end of March, defendant attempted to commit suicide. On April 5, 1980, Williams and the defendant sustained cuts on their arms from a chisel. Defendant received a deep wound inflicted by Williams. During these months there were many fights and usually Williams was the aggressor.

Pam Davis was in the apartment on the night of Williams' death. She testified that Williams was quite intoxicated, that the couple argued, and that Williams pushed the defendant around. After five or ten minutes of fighting, Davis heard nothing. Twenty minutes later she heard Williams leave the kitchen and go to the bedroom where he and the defendant were found by the police.

An indictment against the defendant was returned by the grand jury (Cumberland County) on May 6, 1980, charging defendant with the murder of Frank Williams. Counsel was appointed for Ms. Anaya after she was found indigent. The defendant entered pleas of not guilty and not guilty by reason of insanity. The latter plea was withdrawn before trial. Defendant made several pre-trial motions, including two motions to dismiss the indictment; a motion for copies of jury lists and questionnaires, and a motion for appointment of experts. All were denied.

Trial began on December 1, 1980, in Superior Court, Cumberland County. Defendant's motions for judgment of acquittal entered after the State rested and again after the defendant rested were denied. The jury returned a verdict of guilty of manslaughter on December 8, 1980. Defendant's timely motion for a new trial, alleging seven errors, was denied on January 29, 1981, and this appeal followed seasonably.

II.

At trial, defendant called to the stand Dr. John Bishop, an experienced and qualified psychologist. After an extensive voir dire conducted in the absence of the jury, the trial justice ruled that although Dr. Bishop was qualified to testify about the "battered wife syndrome," the evidence would be excluded as irrelevant, prejudicial, and confusing to the jury. The doctor's testimony would have described his profession's analysis of the behavior and emotional patterns of women suffering from repeated physical abuse inflicted by their husbands or lovers. He characterized abuse as a cyclical process involving three phases: (1) a build-up of tension in the relationship, (2) the occurrence of violent acts, and (3) a reduction in tension. Dr. Bishop also discussed the psychological and environmental factors which contribute to the individual male's disposition towards abuse.

Defendant, later on during the trial, attempted to introduce evidence that she was a victim of the battered wife syndrome. Dr. Myron Krueger, a specialist in internal medicine, testified that he had treated the defendant at least five times for injuries which included a concussion, a black eye, and a laceration in her arm. The presiding justice refused to allow defense counsel to question the doctor about the battered wife syndrome, stating that the evidence was irrelevant and without foundation. The record shows that Dr. Krueger would have stated that he had occasionally seen persons he believed to be victims of the battered wife syndrome and that in his opinion defendant was one of these victims. Defense counsel again moved to introduce Dr. Bishop's testimony unsuccessfully.

Although the defendant did not testify, the record clearly shows that she was relying on a theory of self-defense or provocation [1] to mitigate or justify her conduct. In closing argument, defense counsel admitted that Linda Anaya killed Frank Williams intentionally or knowingly but asserted that defendant acted reasonably to protect herself from another beating. The State's closing argument focused on the "bizarre" behavior of the victim and the defendant, implying that defendant could not have been fearful of Williams since she never attempted to leave him, and suggesting that the injuries received by defendant over the course of several months were part of a loving game, not attempts to commit suicide or the result of physical abuse. Thus, the jury's characterization of the evidence concerning their relationship would have been a crucial factor in deciding whether defendant was guilty of murder or manslaughter or not guilty because her acts were committed in self-defense.

On appeal, we will reverse a decision based on M.R.Evid. 403 to exclude evidence only if the trial justice abused his discretion in so deciding, *State v. Hinds*, Me., 437 A.2d 191 (1981). Interpreting the decision below as one based on Rule 403, we find such an abuse of discretion. Both Dr. Bishop's and Dr. Krueger's testimonies were highly probative and more helpful than confusing to the jury. The record shows that Dr. Bishop would have testified that abused women often continue to live with their abusers even though beatings continue, and that a certain substrata of abused women perceive suicide and/or homicide to be the only solutions to their problems. This evidence would have given the jury reason to believe that the defendant's conduct was, contrary to the State's assertions, consistent with her theory of self-defense. We agree with the District of Columbia Court of Appeals, and various commentators,[2] that where the psychologist is qualified to testify about the battered wife syndrome, and the defendant establishes her identity as a battered woman, expert evidence on the battered wife syndrome must be admitted since it "may have . . . a substantial bearing on her perceptions and behavior at the time of the killing, . . . [and is] central to her claim of self defense." *Ibn-Tamas v. United States*, 407 A.2d 626, 639 (D.C. 1979). Since we cannot say beyond the reasonable doubt required to make the error harmless that this evidence would not have affected the jury's consideration of the self-defense claim, *State v. True*, Me., 438 A.2d 341 (1981), defendant is entitled to a new trial.

We take the precaution of adding comments for the further guidance of the Superior Court on remand. Defendant, sought in two pre-trial motions to dismiss the grand and petit jury arrays on the ground

---

1. The admissibility of preceding events on the issue of provocation and the reasonableness of the actor's reaction of extreme anger or fear presents the problem addressed in *State v. Flick*, Me., 425 A.2d 167 (1981). On this appeal we are concerned only with admissibility on the issue of self-defense.

2. *See* Eber, "The Battered Wife's Dilemma: To Kill or Be Killed," 32 *Hast.L.J.* 895 (1981); Schneider, "Equal Rights to Trial for Women: Sex Bias in the Law of Self Defense", 15 *Harv. C.R.C.L.L.Rev.* 673 (1980); Note, "The Battered Wife Syndrome: A Potential Defense to a Homicide Charge," 6 *Pepperdine L.Rev.* 213 (1978).

that the arrays were not representative of the community and thus violated defendant's right to have the jury drawn from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *State v. Clapp*, Me., 335 A.2d 897 (1975).[3]

■ In conjunction with this challenge, defendant moved for the appointment of two experts in the fields of statistics and demography to aid her in analyzing the composition of the grand jury array. The request sought authority for a maximum expenditure of $500.00. This motion was denied after an adversary hearing at which defense counsel presented the court with evidence indicating that there are 148,000 licensed drivers in Cumberland County but that the county voter registration lists, from which the Grand Jury panel is selected, contain the names of only 90,000 persons. Counsel argued that this was prima facie evidence of the unrepresentative character of the jury.

In light of defendant's attempted evidentiary showing, we find error in the trial court's decision to deny defendant expert assistance. Defendant made a timely request for reasonably necessary expert services under circumstances "in which a reasonable attorney would engage such services for a client having the independent financial means to pay for them." *United States v. Bass*, 477 F.2d 723, 725 (9th Cir. 1973) (interpreting a federal statute defining indigent defendant's right to expert assistance).

■ On remand, defendant may be tried only upon a charge of manslaughter since the conviction for manslaughter "acts as an acquittal of the charge of murder." *State v. Chaplin*, Me., 286 A.2d 325 (1972).

The entry is:

Judgment vacated.

Remanded to the Superior Court for further proceedings consistent with the opinion herein.

All concurring.

3. In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive group" in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Defendant in this case introduced evidence presented by a college sociology professor who testified that, based on a random sample of the 1980 Cumberland County jury pool and the 1970 county census, the following statistical disparities existed for three allegedly "distinctive groups": 8.8% of the jury pool were between 18 and 24 years old and 17% of the community fell into that group; 15% of the jury pool had not obtained a high school degree and 25.6% of the community was in that category. He also testified that based on New England data, persons of low income registered to vote in significantly smaller numbers than persons with incomes over $25,000.00/year.

We express *no opinion on the merits of defendant's challenge to the jury selection system, since on remand defendant may, through expanded use of experts, be able to introduce significantly more statistical evidence on the composition of the jury arrays. We note, however, that her showing so far has been minimal. Defendant identified three groups as underrepresented in jury arrays: youth, persons without a high school degree, and low income persons. However, a number of courts confronted with the issue have found that these categories do not identify a "distinctive group" for purposes of the fair-cross-section test. *See, e.g., United States v. Kleifgen*, 557 F.2d 1293, 1296 (9th Cir. 1977); *United States v. McDaniels*, 370 F.Supp. 298 (E.D.La.1973). *But see Christian v. State*, Me., 268 A.2d 620 (1970). In addition, this Court has specifically stated that: "The scope of the constitutional privilege, ... does not encompass the right to *proportional* class representation. In the administration of the jury laws proportional representation is not a constitutional required factor." (emphasis added) *Christian v. State*, Me., 268 A.2d 620, 624 (1970). We agree with the authors of a recent article *on jury selection who said: "Cross sectional juries are an ideal. What the [United States Supreme] Court has required is a system of jury selection free from discrimination against identifiable groups in the community. But evidence of underrepresentation is *not* proof of discrimination." (emphasis added) W. Macauley & E. Heubel, "Achieving representative juries: a system that works", 65 *Judicature* 126, 129 (1981).