STATE of Maine

v.

Linda ANAYA.

Supreme Judicial Court of Maine.

Argued Jan. 12, 1983.

Decided Feb. 24, 1983.

Charles K. Leadbetter, Joseph E. Wanne-macher, Anita St. Onge (orally), Asst. Attys. Gen., Augusta, for plaintiff.

Jackson & Pallas, Francis M. Jackson (orally), Westbrook, for defendant.

Before McKUSICK, C.J., and GODFREY, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

McKUSICK, Chief Justice.

Defendant Linda Anaya was convicted of manslaughter, 17–A M.R.S.A. § 203(1)(A) (Pamph.1982), after a jury trial in the Superior Court (Cumberland County). In this appeal, she claims that the trial justice erred in 1) denying her motion challenging the composition of the jury pool from which her trial jury was drawn; 2) denying her motion for public funds with which to pursue her jury pool challenge; 3) failing to rule upon or dismissing her "motions to reconsider" the order limiting the public funds available to defendant for her jury pool challenge; 4) admitting testimony about a conversation between defendant and the victim a few months before his

death; and 5) allowing the victim's sister-in-law to testify as a rebuttal witness for the State. We hold that there was no error on the part of the trial justice on any of these issues, and we affirm the judgment of conviction.

This is the second time this case has come to the Law Court. Linda Anaya was indicted for murder by a Cumberland County grand jury on May 6, 1980. The indictment charged her with killing her live-in boyfriend, Frank H. Williams, Jr., "on or about the 8th day of April, 1980." Defendant was found indigent and counsel was appointed to represent her. Before trial, defendant made a number of motions aimed at challenging the procedure used in Cumberland County to select grand and petit jurors,[1] including a motion for the appointment of experts (at public expense) to study the juror selection process and motions to dismiss her indictment on the ground that the grand jury that handed it up was not drawn from a pool fairly representing a cross-section of her community. All were denied.

On December 8, 1980, after a jury trial, Anaya was found guilty of manslaughter, and she appealed to the Law Court. In *State v. Anaya,* 438 A.2d 892 (Me.1981) (*"Anaya I"*), we vacated the judgment of the Superior Court. Although the holding of *Anaya I* was based on the presiding justice's refusal to allow a psychologist and a medical doctor to testify in front of the jury about the "battered wife syndrome" and its possible applicability to defendant Anaya, the opinion went on to discuss defendant's attempts to challenge Cumberland County's grand and petit jury arrays. 438 A.2d at 895.

In late January, 1982, well before defendant's second trial began, she moved in the Superior Court for the appointment of Craig McEwen, Ph.D., a Bowdoin College sociologist, as an expert witness to examine "the nature of the grand and petit jury pools in Cumberland County," and for "reasonable" compensation of Dr. McEwen. The motion was granted. Defendant also moved successfully that she be provided with copies of questionnaires that had been sent out to and returned by members of the 1980–81 and 1981–82 Cumberland County jury pools. On April 28, 1982, less than two weeks prior to the May 10 date set for the beginning of her second trial, defendant moved for the appointment of an expert statistician to help Dr. McEwen analyze the composition of Cumberland County jury pools and for the "authorization" of substantial additional funding for expert analysis of the pools.

A hearing was held on those two motions on May 3, 1982. Ruling from the bench, the Superior Court justice granted the motion for appointment of an expert in statistics and allotted defendant (in addition to the previously approved compensation for Dr. McEwen) "a sum not to exceed $500," out of which she could pursue her jury pool analysis and compensate the statistician.

On May 10, 1982, defendant waived indictment and was arraigned on an information charging her with manslaughter. That

---

1. The grand jury that initially indicted Linda Anaya and the petit (or "traverse") juries sitting at her two trials were selected from a pool of prospective jurors drawn according to 14 M.R.S.A. § 1254 (1980) (repealed by P.L.1981, ch. 705, pt. G, § 13). The most distinctive feature of the jury selection method prescribed by section 1254 was that prospective jurors—members of the "jury pool" from which both grand and petit juries were chosen—were drawn from a list of all registered voters in the county. The jury pool was selected in July of each year to serve from September 1 to August 31 of the following year.

The same legislative act that repealed section 1254 created a new chapter 305 of title 14, which is designed to ensure that prospective jurors are drawn from "the broadest feasible cross-section of the population of the area." 14 M.R.S.A. § 1201–A (Supp. 1982–1983). By new section 1252–A, the "source list" for prospective jurors consists of the combined lists of licensed drivers, persons issued state identity cards, and persons requesting their names to be put on the source list. The source list may be supplemented "with names from other lists specified by the Supreme Judicial Court." For a discussion of comparable provisions of a uniform act, see McKusick & Boxer, *Uniform Jury Selection and Service Act,* 8 Harv.J. on Legis. 280 (1971).

same day, defense counsel asked the court to continue the trial until a "new and properly constituted" jury pool could be drawn from which defendant's trial jury could be selected. Through witnesses, defense counsel attempted to show that Cumberland County's juror selection system produced jury pools that failed to contain a fair cross-section of the community from which they were drawn. Specifically, he argued that persons aged 18 through 24, persons with less than a high school education, and "blue-collar" workers were significantly under-represented in recent county jury pools. The Superior Court justice denied defendant's jury pool challenge, and her trial began.

The prosecution, in its case-in-chief, called four witnesses to testify about the events of May 8 and 9, 1980. The jury could reasonably have concluded from the State's evidence that Anaya stabbed Williams in the back with a knife after the couple had quarreled in the kitchen of the Brunswick apartment they shared, and that the stab wounds caused Williams' death shortly thereafter at a nearby hospital.

Defense counsel, through cross-examination of the State's witnesses and through ten defense witnesses, including a medical doctor and a psychologist, attempted to show that defendant had been a victim of the so-called "battered wife" syndrome throughout her relationship with Williams. It was defense counsel's theory that Anaya had killed Williams in self-defense; the battered-wife evidence was intended to show that she was justified in using deadly force against Williams because of her reasonable belief—reasonable in light of the history of their relationship—that Williams was about to use deadly force against her and that it was necessary for her to use deadly force of her own to defend herself.

After the defense presentation had concluded, the State called the victim's sister-in-law, Patricia Williams, as a rebuttal witness. Over defendant's objections, Patricia was allowed to tell the jury about an incident that had occurred in February of 1980

and to repeat a certain statement the victim had made at that time.

On May 13, 1982, the jury began deliberating, after hearing final arguments from both sides and instructions from the presiding justice. On May 14, the jury came in with a verdict, finding Anaya guilty of manslaughter. On that same day, defendant was sentenced and she immediately filed a notice of appeal to this court.

## I. *The Jury Pool Challenge*

The sixth amendment to the United States Constitution, which guarantees a criminal defendant a trial "by an impartial jury of the State and district wherein the crime shall have been committed," applies to state criminal trials through the due process clause of the fourteenth amendment. *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968). The right to an impartial jury trial includes the right to a petit jury drawn from a "source fairly representative of the community." *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975). *Taylor* held that "the exclusion of women from jury venires deprives a criminal defendant of his Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community." 419 U.S. at 535–36, 95 S.Ct. at 700. Elaborating on the "fair cross-section" rule, the Supreme Court held in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), that a defendant has established a "prima facie violation" of the requirement when he has shown:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

439 U.S. at 364, 99 S.Ct. at 668. There is no requirement that the defendant be a member of the "distinctive" group allegedly excluded from jury venires, *see Taylor,* 419

U.S. at 526, 95 S.Ct. at 695, or that he show that any particular prejudice to him has resulted from the unlawful juror selection system, *see id.* at 538, 95 S.Ct. at 701 (Rehnquist, J., dissenting). The fair cross-section rule is designed in part to ensure "[c]ommunity participation in the administration of the criminal laws," which is "critical to public confidence in the fairness of the criminal justice system." *Id.* at 530, 95 S.Ct. at 698.[2]

Using language similar to that of the Bill of Rights, our Maine Constitution gives a criminal defendant the right to an "impartial trial ... by a jury of the vicinity." Me.Const. art. I, § 6. In *State v. Clapp,* 335 A.2d 897 (Me.1975), we held that because the sixth amendment had been incorporated into the fourteenth amendment's due process clause, the federal fair cross-section requirement "becomes automatically absorbed into the guarantee of jury trial embodied in Article I, Section 6 of the Constitution of Maine." 335 A.2d at 900. We reaffirmed the substantial identity of a defendant's rights under the state and the federal jury trial provisions in *Anaya I,* 438 A.2d at 895 n. 3, where we quoted *Duren v. Missouri's* tripartite test for a prima facie violation of the fair cross-section requirement. It is that test, therefore, which we apply today to determine whether Linda Anaya has established a violation of her rights under

either the federal or the state constitution. Because we conclude that she fails the first prong of the *Duren* test, we hold that the Superior Court was correct to deny her challenge.

The three groups that Anaya identifies as being systematically underrepresented in Cumberland County jury pools are persons aged 18 through 24, persons with less than a high school education, and "blue-collar" workers.[3] In considering whether these groups are "distinctive" for purposes of a jury pool challenge, we are guided by a number of federal and state cases further refining the Supreme Court's concept of "distinctiveness." *United States v. Test,* 550 F.2d 577 (10th Cir.1976), held that a group is not cognizable for purposes of a jury pool challenge unless it possesses:

> (1) ... some quality or attribute which "defines and limits" the group; (2) a cohesiveness of "attitudes or ideas or experience" which distinguishes the group from the general social milieu; and (3) a "community of interest" which may not be represented by other segments of society.

550 F.2d at 591 (quoting *United States v. Test,* 399 F.Supp. 683, 689 (D.Colo.1975)). Stating virtually the same proposition in the negative, the Ninth Circuit has held that groups that "have no internal cohesion," that are not "viewed as an identifia-

---

**2.** At oral argument, counsel for defendant agreed that his client's jury pool challenge is based entirely on her sixth amendment/due process right to a petit jury drawn from a pool fairly representative of the community and not on her rights under the equal protection clause. In fact, Anaya would be unable to maintain an equal protection claim on the record before this court. To make such a claim, a defendant "must show that the procedure employed [for selecting jurors] resulted in substantial underrepresentation *of his race or of the identifiable group to which he belongs.*" *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) (emphasis added). *See also Rose v. Mitchell,* 443 U.S. 545, 565, 99 S.Ct. 2993, 3005, 61 L.Ed.2d 739 (1979). Anaya has made no showing that she is between the ages of 18 and 24, that she has less than a high school education, or that she is a "blue-collar" worker.

**3.** Anaya produced evidence, through sociologist McEwen, indicating that 17.2% of the Cumberland County population was 18 through 24 years old, while 8.5% of the 1980–81 and 1981–82 county jury pool members were in that category. Persons with less than a high school education assertedly constituted 35.9% of the county population and 11.4% of the jury pools studied. "Blue-collar" workers were said to make up 41.9% of the county population and 25.1% of those members of the jury pools who could be identified as either "blue-collar" or "white-collar."

All of Dr. McEwen's demographic statistics for Cumberland County were taken from the 1970 U.S. census. His juror sample consisted of 1,228 members of the 1980–81 and 1981–82 jury pools who had returned jury questionnaires. Some individuals among the 1,228 surveyed failed to supply the requested information as to age, educational level, or occupation, and therefore could not be categorized at all.

ble class by the general population," and whose members "have diverse attitudes and characteristics which defy classification" are not cognizable groups for jury challenge purposes. *United States v. Kleifgen,* 557 F.2d 1293, 1296 (9th Cir.1977). And the Indiana Supreme Court uses a shorthand formula, requiring a group to be "distinct from the rest of society in a significant way, having interests which cannot be adequately represented by other members of the trial panel." *Grassmyer v. State,* 429 N.E.2d 248, 251 (Ind.1982).

4. *See, e.g., United States v. Kliefgen,* 557 F.2d at 1296.

5. *See, e.g., Duren v. Missouri,* 439 U.S. at 364, 99 S.Ct. at 668 (1979).

6. The primary problem with an age-defined group is that, in the words of *United States v. Guzman,* 337 F.Supp. 140, 143 (S.D.N.Y.), aff'd, 468 F.2d 1245 (2d Cir.1972), *cert. denied,* 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973), its "membership shifts from day to day." *See also Davis v. Greer,* 675 F.2d 141, 146 (7th Cir.1982); *Brown v. Harris,* 666 F.2d 782, 784 (2d Cir.1981), *cert. denied,* 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982); *United States v. Kliefgen,* 557 F.2d at 1296; *United States v. Potter,* 552 F.2d 901, 905 (9th Cir. 1977); *United States v. Test,* 550 F.2d at 591; *United States v. Gast,* 457 F.2d 141, 142 (7th Cir.), *cert. denied,* 406 U.S. 969, 92 S.Ct. 2426, 32 L.Ed.2d 668 (1972); *United States v. Kuhn,* 441 F.2d 179, 181 (5th Cir.1971); *United States v. DiTommasso,* 405 F.2d 385, 391 (4th Cir.), *cert. denied,* 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1968); *Grassmyer v. State,* 429 N.E.2d at 251; *Commonwealth v. Bastarache,* 382 Mass. 86, 414 N.E.2d 984, 992–93 (1980); *State v. Elbert,* 121 N.H. 43, 46, 424 A.2d 1147, 1149 (1981); *State v. Price,* 301 N.C. 437, 446, 272 S.E.2d 103, 110 (1980). The only case we have found that concludes that young persons—in that case, those aged 21 through 34—constitute a "distinctive" group is *United States v. Butera,* 420 F.2d 564, 570 (1st Cir. 1970). *Butera* has been noted by many courts faced with the problem that we face today, but remains a "judicial rarity." *Commonwealth v. Bastarache,* 414 N.E.2d at 993 n. 10 (quoting *Foster v. Sparks,* 506 F.2d 805, 824 (5th Cir. 1975)). In any event, the *Butera* conclusion that the wider age group of 21 through 34 was "distinctive" was not essential to the decision of the First Circuit, which for other reasons rejected the jury challenge.

7. *See, e.g., United States v. Kliefgen,* 557 F.2d at 1296; *United States v. Potter,* 552 F.2d at

Certain groups—such as those defined by race [4] or sex [5]—are unquestionably "distinctive." Ordinarily, however, a defendant must make a factual showing that the group or groups allegedly excluded from the jury pool are properly cognizable for purposes of the sixth amendment's fair cross-section requirement. Courts faced with claims similar to Anaya's have held overwhelmingly that groups defined by age,[6] by lack of education,[7] and by occupational status [8] cannot be considered "distinctive" absent proof of their limiting quali-

905; *United States v. Marcano,* 508 F.Supp. 462, 470 (D.P.R.1980); *People v. Estrada,* 93 Cal.App.3d 76, 91–92, 155 Cal.Rptr. 731, 740 (1979). *United States v. Butera,* 240 F.2d at 571, is again a lonely exception.

8. *See, e.g., United States v. Kliefgen,* 557 F.2d at 1296 n. 6 ("the unemployed"); *United States v. Marcano,* 508 F.Supp. at 469 ("persons of the working class"); *Quadra v. Superior Court,* 378 F.Supp. 605, 621 (N.D.Cal.1974) ("low income blue collar workers"); *People v. Estrada,* 93 Cal.App.3d at 93, 155 Cal.Rptr. at 741 ("blue-collar workers"); *People v. Navarette,* 54 Cal. App.3d 1064, 1077, 127 Cal.Rptr. 55, 63 (1976) ("blue-collar workers"). *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 223–24 (1946), 66 S.Ct. 984, 987, 90 L.Ed. 1181, which refused to sanction civil jury selection procedures tending "to discriminate against persons of low economic and social status," did not hold that such persons form a "distinctive" class for constitutional purposes; *Thiel* relief for its authority on the Supreme Court's supervisory power over the federal judicial system. *See Quadra,* 378 F.Supp. at 622. Insofar as Anaya intended the "blue-collar" group to be a rough approximation for a class consisting of low income persons, we are utterly unpersuaded that the correlation between such a tenuous occupational classification and a class defined by its low income is strict enough to allow the one group to stand proxy for the other. Dr. McEwen himself would say only that "on the average white collar workers are better compensated in our society than blue collar workers."

Moreover, had Anaya succeeded in demonstrating an underrepresentation of low income persons in the Cumberland County jury pools, we would still require factual proof of that group's distinctiveness in the Cumberland community before we could accept her claim that the underrepresentation violated the fair cross-section requirement. *See People v. Estrada,* 93 Cal.App.3d at 92–93, 155 Cal.Rptr. at 741 ("households with family incomes of less than

ties, cohesiveness of experience, and commonality of interest *in the community from which the challenged jury was drawn.* "[C]ognizability will necessarily vary with local conditions." *United States v. Potter,* 552 F.2d 901, 903 (9th Cir.1977). "Whether a cognizable class exists within a community is a factual question to be answered in the context of the community." *United States v. Abell,* 552 F.Supp. 316, 324 (D.Me. 1982). *See also Hernandez v. Texas,* 347 U.S. 475, 478–79, 74 S.Ct. 667, 670–71, 98 L.Ed. 866 (1953); *State v. Clapp,* 335 A.2d at 901.

■ Linda Anaya has made virtually no showing that the young, the less well-educated, or "blue-collar" workers have any limiting qualities, cohesion of experience, or community of interest sufficient to set them apart from the general population of Cumberland County. The record in this case reveals only that Dr. McEwen, defendant's expert, testified very generally about the different "perspectives" of various groups. He said that the variables of "[s]ex, age, income, occupation, educational level, race, religion, [and] . . . size and place of residence" are useful to sociologists because "they give some indication of different kinds of experiences and different social positions, different perspective on issues that are predictive of attitudes and values." He never spoke any more specifically than that of the effect of educational or occupational variables alone on a group's attitudes or experiences. Referring to groups defined by age, Dr. McEwen stated that "average or typical" views of the criminal justice system and of "women's issues" tend to vary according to age group. The sociologist never specified that the 18-to-24 age group tends to hold views on these subjects significantly different from the views of slightly older persons. Nor did he ever suggest that any of the three groups we are asked to declare "distinctive" is internally cohesive, is recognized as a separate class

by others in the community, or has interests that cannot be adequately represented by other members of the public. In the absence of a more specific showing that Cumberland County's young people, less well-educated residents, and blue-collar workers possess any of the attributes of "distinctiveness" set forth in *United States v. Test,* we decline to hold those groups cognizable for purposes of a petit jury pool challenge. It is therefore unnecessary for us to consider whether Anaya's statistical evidence was sufficient to show that the representation of these three groups in the pool from which her jury was selected was "not fair and reasonable" or whether the claimed underrepresentation was due to "systematic exclusion of the group[s] in the jury selection process."

## II. *The Request for Public Funds*

The sixth amendment to the United States Constitution, as applied to the states through the fourteenth amendment's due process clause, guarantees to every criminal defendant a fair trial and the right to the effective assistance of counsel. The equal protection clause of the fourteenth amendment further ensures that no defendant will be deprived of his rights on account of his poverty. The Maine Constitution echoes the Bill of Rights in these matters, guaranteeing every criminal defendant an "impartial" trial, the assistance of counsel, and equal protection of the laws. Me. Const. art. I, §§ 6, 6–A.

Read together, these three guarantees have been interpreted to require that an indigent defendant be provided with a court-appointed lawyer at trial, *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and at a first appeal as of right, *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). A free hearing or trial transcript must also be provided if that transcript is necessary to the defendant's defense or appeal. *Griffin v.*

$15,000" is not a cognizable group for jury challenge purposes absent proof of members' unique views); *United States v. Abell,* 552

F.Supp. 316, 324 (D.Me.1982) ("lower socioeconomic class" not proven to be cognizable in Maine).

**1262**

*Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); *Britt v. North Carolina,* 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971); *State v. Curtis,* 399 A.2d 1330 (Me. 1979).

 Defendant argues that her rights to a fair trial, to the effective assistance of counsel, and to the equal protection of the laws were violated when the Superior Court authorized only an additional $500 to pursue further her jury pool challenge. We agree, of course, with the principle on which her claim must be based: that "the State must . . . provide indigent prisoners with the basic tools of an adequate defense." *Britt v. North Carolina,* 404 U.S. at 227, 92 S.Ct. at 433. And we agree that under some circumstances an indigent criminal defendant is entitled to funding for services other than an attorney and a transcript. Expert assistance such as Anaya sought must be made available when it is necessary "in order to insure effective preparation of [the] defense by [defendant's] attorneys." *Mason v. Arizona,* 405 F.2d 1345, 1351 (9th Cir.1974), *cert. denied,* 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975). However, "such assistance is not mandatory but rather depends upon the need as revealed by the facts and circumstances of each case." *Id.* at 1352.

*Mason* was a federal habeas corpus case brought by a defendant whose motion for investigative funds had been denied by the Arizona judge presiding over his murder trial. The Ninth Circuit held that no constitutional violation is demonstrated until the defendant shows that "the denial or restriction of . . . funds has substantially prejudiced the defendant at the state court trial." 405 F.2d at 1352. Moreover, "in determining whether such a showing has been made, due consideration must be given to the question of whether defense counsel, at the time of requesting the allowance of funds, made as complete a showing of necessity as could then be reasonably expected of him." *Id.* This two-part test, which requires the defendant to make a reasonable showing of necessity at the trial stage

and a showing on appeal that he has been prejudiced by the denial of funds below, has been adopted by a number of state and federal courts faced with claims that indigent defendants were wrongly denied state funds with which to defend themselves against criminal charges. *See, e.g., Williams v. Martin,* 618 F.2d 1021, 1026 (4th Cir.1980) (expert medical witness); *Smith v. Enomoto,* 615 F.2d 1251, 1252 (9th Cir.), *cert. denied,* 449 U.S. 866, 101 S.Ct. 199, 66 L.Ed.2d 84 (1980) (investigative services); *McKenzie v. Osborne,* 640 P.2d 368, 374–75 (Mont.1982) (psychiatrist); *Oregon v. Acosta,* 41 Or.App. 257, 260, 597 P.2d 1282, 1284 (1979) (interpreter and polygraph expert). In *State v. Ledger,* 444 A.2d 404, 420 (Me. 1982), we implicitly endorsed the *Mason* standard ourselves, holding that the indigent defendant in that case was properly denied funds to investigate possible juror prejudice because "the court below was not presented with a sufficient basis to conclude that such an investigation would be necessary."

In *Anaya I,* 444 A.2d at 895, we suggested in a dictum that state funds for expert services should be provided under circumstances " 'in which a reasonable attorney would engage such services for a client having the independent financial means to pay for them'." The quote came from *United States v. Bass,* 477 F.2d 723, 725 (9th Cir.1973), which was interpreting a provision of the federal Criminal Justice Act of 1964, 18 U.S.C. § 3006A(e) (1976). Section 3006A(e) authorizes federal courts to furnish indigent criminal defendants with funds for "services necessary for an adequate defense." The "reasonable attorney" standard stated in *Bass* was an attempt to define "a clear standard for deciding what constitutes 'necessity' under § 3006A(e)." 477 F.2d at 725. Other federal courts have articulated section 3006A(e)'s "necessity" rule without any reference to what a reasonable attorney would or would not do. *See, e.g., United States v. Canessa,* 644 F.2d 61, 64 (1st Cir.1981); *United States v. Mundt,* 508 F.2d 904, 908 (10th Cir.1974),

*cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975); *United States v. Washabaugh,* 442 F.2d 1127, 1130 (9th Cir. 1971).

▇ The issues and arguments presented by the present appeal have convinced us that, while the *Bass* standard may be appropriate for funding requests made in the federal courts under section 3006A(e), it cannot be the threshold test for making out a "straight" constitutional claim in the absence of such a statute. Neither the state nor the federal constitution requires that an indigent defendant be provided with every service thought to be "reasonable" by attorneys with paying clients charged with serious crimes. As between rich and poor defendants, "absolute equality is not required; lines can be and are drawn." *Douglas v. California,* 372 U.S. at 357, 83 S.Ct. at 816. An indigent defendant has a constitutional right only to those services essential or necessary to an adequate defense. Therefore, we hold today that an indigent accused requesting public funds for experts must first show the trial court, to the extent he reasonably can then be expected to do so, why the services are necessary for an adequate defense; to appeal successfully from a denial of his request for funds, he must have been substantially prejudiced by the action of the trial court. Careful analysis of the research projects that Anaya proposed to carry out with additional funding reveals that, as to each, Anaya has failed to satisfy one or both of those two requirements.

Defendant asked the Superior Court to give her up to $29,000, in addition to the funds already authorized, to investigate and document the possible underrepresentation of various groups in Cumberland County's jury pools. Dr. McEwen's affidavit, submitted in support of defendant's "Motion for Authorization," fully explained the uses to which the money would be put. Through mail and phone surveys, personal interviews, and computer analyses, Dr. McEwen proposed to do essentially two things. First, he wanted to document as reliably as

possible the claimed underrepresentation of persons aged 18 through 24, persons who had not completed high school, and "blue-collar" workers in the Cumberland County jury pools. To do this, he intended to analyze the returned juror questionnaires from 1980–81 and 1981–82 that had already been made available to him (these contained information on the prospective jurors' ages, educational achievements, and occupation), to conduct personal interviews with 1980–81 and 1981–82 jury pool members who had failed to return questionnaires, and to survey, by mail or by phone, members of earlier jury pools whose returned questionnaires no longer were available. Second, he proposed to investigate the possible underrepresentation, in several years' worth of jury pools, of groups defined by sex, national origin, religion, and low income. This information was not available to Dr. McEwen through the existing juror questionnaires; consequently, he was prepared to survey a sample of the 1980–81 and 1981–82 jury pool members, either by mail or by telephone. "Because personal income is considered to be a very private matter in our society," wrote Dr. McEwen, "questions about income would have to be 'buried' in a longer questionnaire dealing with social and political attitudes in order for valid data to be obtained."

▇ As to that portion of Anaya's funding request earmarked for use in further documentating the alleged underrepresentation of the young, the undereducated, and "blue-collar" workers, we must affirm the Superior Court's denial of the motion because Anaya was not substantially prejudiced by that denial. *Duren v. Missouri* requires a defendant to show that a *distinctive* group is systematically underrepresented in the pool from which the trial jury was selected. In this case, Anaya failed to make any showing that the young, the undereducated, and "blue-collar" workers are distinctive groups in Cumberland County. Her jury pool challenge would have failed, therefore, no matter how sophisticated her statistics were on the underrepresentation

of these groups in recent jury pools. For the same reasons, we must affirm the Superior Court's denial of the motion as to those funds with which Anaya proposed to prove that low income persons were statistically underrepresented in the jury pools. Poor people do not constitute a cognizable group for jury challenge purposes absent proof of their distinctiveness in the relevant community, and Dr. McEwen's affidavit shows that the state funds, had they been authorized, would not have been used to make the required showing of distinctiveness.[9]

As to that portion of Anaya's funding request earmarked for her expert's use in researching the possible underrepresentation of groups defined by sex, religion, and national origin, we conclude that the Superior Court correctly denied the motion because Anaya failed to show, to the extent she reasonably could be expected to do so, why the research was necessary for an adequate defense. Even if we assume that all of those groups would qualify as distinctive without proof of their cohesiveness and community of interest in Cumberland County, we note that Anaya failed to tell the court why she had any reason to believe that those groups might be underrepresented in the jury pools. The record is devoid of any theory or even an articulable hunch to indicate that research in this direction

might prove fruitful. The criminal defendant's right to an adequate defense does not include a right to go on a wild goose chase at public expense.

### III. The Motions to Reconsider

On May 3, 1982, Anaya's "motion for authorization" was granted to the extent of $500, far less than she had requested. The May 3 ruling was made orally, after an evidentiary hearing. On May 7, defendant filed a "motion to reconsider" the ruling. The motion requested the court to "reconsider that portion of its order finding as a matter of fact that it would be unreasonable to spend [the] sums indicated in Dr. McEwen's affidavit." On May 10, the Superior Court justice filed a written order echoing his bench ruling of May 3.

On July 26 and August 13, 1982, defendant filed "amended motion[s] to reconsider," again requesting the Superior Court to take a new look at the factual findings contained in its order denying Anaya anything over $500 to complete her jury pool analysis. Both were dismissed by a written order filed on August 13, stating that the Superior Court was unable to take further action in the case under M.R.Crim.P. 37(d),[10] since defendant's notice of appeal to the Law Court had already been filed.[11] De-

---

**9.** Although the McEwen affidavit did mention that questions about the prospective jurors' "social and political attitudes" would be asked during the proposed mail or phone survey, it is clear from the context of the affidavit that the attitudinal questions were intended merely to mask or camouflage the income questions in which Dr. McEwen was primarily interested. In any event, neither defense counsel nor his expert witness articulated any likely basis for expecting that any amount of sociological research would show that the young, the undereducated, "blue-collar" workers, and low income persons are in fact cognizable groups within the Cumberland County population for purposes of the attempted constitutional challenge. Thus, even if Dr. McEwen had proposed to spend·public money for research on the group-cognizability question, Anaya's request would have failed for lack of a showing of necessity.

**10.** M.R.Crim.P. 37(d) states, in pertinent part, that upon receipt of the notice of appeal

[t]he Superior Court shall take no further action pending disposition of the appeal by the Law Court except: the appointment of counsel for an indigent defendant; the granting of a stay of execution and the fixing or revocation of bail pending appeal; proceedings for a new trial on the ground of newly discovered evidence; and other action necessary for prosecution of the appeal as provided by these rules.

**11.** The record in this case shows that the jury found Anaya guilty of manslaughter on May 14, 1982, that the trial justice sentenced her on May 14, and that she filed her notice of appeal to the Law Court on May 14. The judgment was not entered on the docket, however, until July 7, 1982. M.R.Crim.P. 37(c) states, "A notice of appeal filed after verdict or finding of guilty but before entry of judgment shall be treated as filed on the day of entry of judgment." Therefore, we must treat Anaya's notice of appeal as having been filed on July 7.

fendant now argues that the Superior Court erred in failing to rule upon the first motion and in dismissing the second and third. Her claim is without merit.

"Generally, a party is entitled to a ruling on a motion." *Jones v. Suhre,* 345 A.2d 515, 517 (Me.1975). However, *Jones* is of no help to Anaya, since she got rulings on all of her reconsideration motions.

The May 7 motion was effectively denied by the Superior Court's written order limiting Anaya to $500 in public funds to complete her jury pool challenge, filed May 10 and reaffirming the bench ruling of May 3. As for the motions filed on July 26 and August 13, they were properly dismissed by the Superior Court under Rule 37(d), as both were filed after July 7, the day on which we must treat her notice of appeal as having been filed.

### IV. *The Victim's Statement*

Patricia Williams, the victim's sister-in-law, was called to the stand by the State as a rebuttal witness. Over defendant's objection, she was allowed to testify that she had visited the victim and Anaya at their apartment in February, 1980. The victim, Frank Williams, had shown Patricia a small cut on his back and had told her, in Anaya's presence, how he had been injured:

Q [by the prosecutor]: What did Frank Williams say? Do you remember the context?

A [by Patricia Williams]: Look what that "F" and fool did to me.

Q What did Linda Anaya say?

A She just laughed and said she would do a better job next time.

Defendant now argues that the victim's statement, as repeated by Patricia Williams, was inadmissible hearsay and should not have been heard by the jury. We disagree.

The fact that she filed a second notice of appeal on July 27, apparently uncertain of the effectiveness of her initial notice of appeal, does not alter our analysis.

Ordinarily, any statement "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" is hearsay and is inadmissible. M.R.Evid. 801(c); 802. However, since "a party cannot object to his failure to have a chance to cross-examine himself," Field & Murray, *Maine Evidence* 193 (1976), the rules provide that a statement is not hearsay and is admissible if "[t]he statement is offered against a party and is (A) his own statement in either his individual or a representative capacity or (B) a statement of which he has manifested his adoption or belief in its truth." M.R.Evid. 801(d)(2).

■ Thus, Anaya's own words, as repeated by Patricia Williams, were unquestionably admissible. And since Anaya's statement was intelligible only in the context of the conversation preceding it, and in fact constituted an admission of the truth of the accusation she had just heard, Frank Williams' statement was properly admitted as well. The conversation was "a reciprocal and integrated utterance between the two of them," *United States v. Metcalf,* 430 F.2d 1197, 1199 (8th Cir.1970); in its entirety it constituted "a total context showing admissions by defendant." *State v. Blouin,* 384 A.2d 701, 705 (Me.1978).

### V. *The Rebuttal Witness*

■ At trial, defendant not only objected to that portion of Patricia Williams' testimony recounting the conversation between defendant and the victim discussed in Part IV above, but also objected to the State's use of Patricia at all as a rebuttal witness. Citing studies showing that juries tend to be disproportionately influenced by the most recent testimony heard,[12] defendant argues that the presiding justice should have kept Patricia off the stand under M.R. Evid. 611(a).[13]

12. *E.g.,* Lawson, *Order of Presentation as a Factor in Jury Persuasion,* 56 Ky.L.J. 521 (1968).

13. M.R.Evid. 611(a) states, in pertinent part: "The court shall exercise reasonable control

Rebuttal evidence is proper if it "repels or counteracts the effect of evidence which has preceded it." *Emery v. Fisher,* 128 Me. 124, 125, 145 A. 747 (1929). A presiding judge's decision to allow rebuttal testimony may be reversed only for abuse of discretion. *State v. Gullifer,* 384 A.2d 48, 50 (Me.1978). In the case at bar, the defense had put on a number of witnesses in its attempt to show that Anaya was a "battered wife" and had killed in self-defense. Among those witnesses was a psychologist who testified that battered wives typically stay with their men out of economic dependency, and that they "most frequently ... react with passivity" to the violence of their mates. Patricia Williams then took the stand to recount the February stabbing incident and to testify that the victim held no steady job throughout the time he lived with defendant. Thus, her testimony tended to refute the battered-wife defense. We cannot say that the presiding justice abused his discretion in permitting the State's rebuttal. *See State v. Armstrong,* 344 A.2d 42, 47–48 (Me.1975) (where defense psychiatrist had told the jury that defendant had a close relationship with his parents, prosecution could put defendant's father on the stand to testify that defendant had never called his father "Dad" or by other familiar terms).

The entry is:

Judgment of conviction affirmed.

All concurring.

over the mode and order of interrogating witnesses and presenting evidence on direct and cross-examination so as to (1) make the interrogation and presentation effective for the ascertainment of the truth."